UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TBD BREWING LLC (D/B/A AERONAUT BREWING CO.),<br><br>Plaintiff,<br><br>v.<br><br>BENJAMIN HOLMES and FERMENTATION ARTS BRASSERIE, LLC<br><br>Defendants. | Case No. 1:20-cv-10072 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff, TBD Brewing LLC, d/b/a Aeronaut Brewing Co. ("Aeronaut" or "Plaintiff") requests a temporary restraining order and preliminary injunction enjoining Defendants Benjamin Holmes ("Mr. Holmes") and Fermentation Arts Brasserie, LLC ("FAB") (collectively, "Defendants") from unfairly competing with Aeronaut by using Aeronaut's trade secrets and confidential information including secret recipes, proprietary customer lists, quantitative business plans misappropriated by Mr. Holmes.

Aeronaut is a successful brewery based in Somerville founded by Ronn Friedlander, Daniel Rassi and Mr. Holmes in 2013. In December 2019, Aeronaut discovered that Mr. Holmes had, without its knowledge, and while still serving as a Board Member, founded a competing brewery, FAB, and had actively taken Aeronaut property, resources, trade secrets and confidential information to use in his new venture. In particular, Aeronaut has evidence Mr. Holmes accessed Aeronaut's password protected recipes around the time FAB began brewing

beer, exported tens of thousands of customer contacts including proprietary information such as purchase history and preferences, and viewed and assigned permission to dozens of sensitive business plans and financial models to accounts outside of Aeronaut. Moreover, FAB's cans precisely copy Aeronaut's label design which include unique design elements, risking customer confusion. An order from this Court is necessary to prevent Mr. Holmes and FAB from using Aeronaut's proprietary information to unfairly compete for Aeronaut's business and cause irreparable harm.

## Factual Background[1]

Mr. Friedlander, Mr. Rassi and Mr. Holmes founded Aeronaut in 2013. Affidavit of Ronn Friedlander at ¶ 1. Aeronaut was a success, and grew into a popular and well-regarded brewery. *Id.* Over the past two years, due to concerns about Mr. Holmes's management style, Aeronaut has worked with Mr. Holmes to reduce his role at the company, although he remained on the Board of Managers and an officer collecting a salary through the end of 2019. *Id.* at ¶ 3. In December 2019, Aeronaut discovered that Mr. Holmes had, without its knowledge, founded a competing brewery and was actively taking Aeronaut property, resources, trade secrets, and proprietary information, including secret Aeronaut beer recipes, to use in his new venture. *Id.*

This first came to light in December 19, 2019 when Mr. Friedlander and Mr. Rassi became aware that Mr. Holmes tried to commandeer one of Aeronaut's Instagram accounts by changing the username, contact information and password. *Id.* at ¶¶ 4-5. Concerned with Mr. Holmes's meddling with Aeronaut's social media account, Mr. Friedlander and Mr. Rassi investigated and learned that Mr. Holmes had created a new, directly competing company called

---

[1] Aeronaut's allegations and claims are described fully in its Complaint and in the Affidavit of Ronn Friedlander which are incorporated by reference.

"FAB Beer" while he was still serving as a Manager and Member of Aeronaut. *Id.* at ¶ 7-9. In fact, by at least December 2019, Mr. Holmes had already created a website for FAB, which noted that it had started making beer on December 3, 2019 and December 4, 2019, and that a new batch was tasted on December 6, 2019 and was set to be released during the week of December 15, 2019. *Id.* at ¶¶ 10-11.

On November 21, 2019, at exactly the time FAB would have needed to provide recipes to a contract brewer, Mr. Holmes looked up how to print recipes from the password protected software program Aeronaut uses to store its recipe information, Ekos Brewmaster, and in fact accessed four confidential and proprietary recipes as well as a report listing all of Aeronaut's ingredients for all its beers. *Id.* at ¶¶ 12-13. The recipes Mr. Holmes viewed were some of Aeronaut's most successful and shared many sensory qualities with FAB's beer. *Id.* at ¶ 13.

In addition to Aeronaut's recipes, Mr. Holmes took Aeronaut's label design and is using it at FAB. *Id.* at ¶14-16. Aeronaut's labels include unique design features such as an unusual font, a distinctive design element encouraging customers to "I am art…[place] me somewhere special," and a mix of landscape-oriented and portrait-oriented cans that no other beer company uses. *Id.* Moreover, FAB is using an Aeronaut Universal Product Code ("UPC"), which Aeronaut purchased and used for a beer that is still on retailers' shelves. FAB's labels are essentially identical to Aeronaut's proprietary designs. *Id.* at ¶¶ 18-20. Not only does this risk customer confusion, but numerous retailers and customers have contacted Aeronaut and expressed actual confusion about what FAB is and how it relates to Aeronaut. *Id.* at ¶ 19.

Mr. Holmes also took Aeronaut customer lists, business plans and proprietary information which were the result of years of proprietary Aeronaut efforts. *Id*. at ¶¶ 21-27. For example, between November 26 and 27, 2019, Mr. Holmes exported over 20,000 of Aeronaut's contacts from MailChimp, which is a password protected email marketing service Aeronaut uses to connect with customers,

visitors, vendors, and distributors regarding company news, events and products. *Id*. at ¶¶ 21-22. On November 27, 2019, Mr. Holmes exported and retrieved customer lists from Eventbrite, a password protected event management and ticketing service Aeronaut utilizes. *Id.* at ¶ 23. The Eventbrite information included customer names and email addresses as well as valuable information regarding the preferences and purchase history for over 14,000 visitors to the Aeronaut brewery and taproom as well as approximately 2,500 customer billing addresses, and associated significant sales transaction amounts in ticket sales. *Id*. at ¶¶ 23-24. Mr. Holmes also accessed, downloaded or improperly granted permission to Aeronaut's proprietary customer lists, financial reports, and detailed quantitative modelling for possible Aeronaut expansion stored on Aeronaut's Google Drive. *Id.* at ¶¶ 26-27. All of this information is valuable, proprietary company property, which Aeronauts keeps strictly confidential and to which Mr. Holmes had no legitimate reason to access. *Id*. at ¶¶ 21-27.

## Argument

### I.   Legal Standard

To succeed on a motion for a preliminary injunction, the movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that the injunction is in the public interest." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc*., 645 F.3d 26, 32 (1st Cir. 2011) and *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)). "While all these factors must be weighed, the cynosure of this four-part test is more often than not the movant's likelihood of success on the merits." *Borinquen Biscuit Corp. v. M.V. Trading Corp*., 443 F.3d 112, 115 (1st Cir. 2006); *see also Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)

("The sine qua non of [the four-factor] formulation is whether the plaintiffs are likely to succeed on the merits.").

## II. The Standard for a Preliminary Injunction has Been Met

### a. Aeronaut Has Established a Likelihood of Success on the Merits

Aeronaut is entitled to a preliminary injunction because it has a high likelihood of success on the merits of its claims. The complaint alleges Mr. Holmes improperly took Aeronaut property, resources, trade secrets and confidential information to use in his new competing venture, FAB.

"Under Massachusetts law, a plaintiff must establish three elements to demonstrate tortious misappropriation of a trade secret: 1) the information at issue must constitute a trade secret, 2) the plaintiff must have taken reasonable steps to secure the confidentiality of the trade secret, and 3) the defendant must have used improper means to obtain the trade secret." *Optos, Inc. v. Topcon Medical Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (internal citation omitted); *Incase Inc. v. Timex Corp.*, 488 F. 3d 46, 52 (1st Cir. 2007) (recognizing that trade secret claims brought pursuant to M.G.L. ch. 92, § 42 are "essentially equivalent" to common law misappropriation of trade secrets claims). A trade secret is information used in one's business that gives the owner an opportunity to obtain an advantage over competitors who do not know or use the secret. *See J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970). The determination of what constitutes a trade secret under Massachusetts depends on six factors established in *Jet Spray Cooler, Inc. v. Crampton*, 282 N.E.2d 921 (Mass. 1972):

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors;

(5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Here, Mr. Holmes accessed Aeronaut recipes, exported customer lists and viewed sensitive business plans and financial models. It took Aeronaut years of effort at great expense to develop successful recipes and it maintains those recipes on a password protected database to which only certain key employees and Managers have access. Friedlander Affidavit at ¶ 12; *see Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass. App. Ct. 937, 939 (1984) (finding a specific recipe for chocolate chip cookies was a trade secret even though the basic ingredients would be common to any chocolate chip cookie). Aeronaut's MailChimp and Eventbrite customer lists were derived from hundreds of events and contacts targeting Aeronaut's most engaged consumers. Friedlander Affidavit at ¶¶ 21-26; *see Optos, Inc.*, 777 F.Supp. 2d at 238 (applying the *Jet Spray Cooler* factors in finding customer lists were trade secrets). Aeronaut's Google Drive business plans and financial models reflect many hours of work aimed at growing and improving its competitive advantage. *See EMC Corp. v. Breen*, No. 12-04477-BLS2, 2013 WL 1907460, at *4-5 (Mass. Super. Ct. Feb. 25, 2013) (protecting "the overall confidentiality of executive planning and decision making about [its marketing] strategy," "the timing of product offerings," three-year "roadmaps" containing "competitive opportunities and competitive threats,"); *Protégé Software Servs., Inc. v. Colameta*, Civ. A. No. 09-03168, 2012 WL 3030268, at *12 (Mass. Super. July 16, 2012) (finding that "business plans and strategies ... may constitute trade secrets").

The materials Mr. Holmes accessed and took, which are the result of Aeronaut's hard work and investment, are absolutely essential to its business. They provide Aeronaut a competitive edge, which is why it safeguards them carefully. These are trade secrets and Mr.

Holmes's covert accessing, exporting and copying them in order to compete against the company in which he was director, officer and shareholder was improper.[2]

Importantly, Mr. Holmes' misappropriation of trade secrets also constitutes a violation of chapter 93A. *See Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243, 75 U.S.P.Q.2d 1225 (1st Cir. 2005) ("Under Massachusetts law, misappropriation of a trade secret alone can constitute a violation of Chapter 93A"); *Peggy Lawton Kitchens*, 18 Mass App. Ct. at 938 (a finding of misappropriation of trade secret also supported a finding of a violation of 93A); *Prescott v. Morton Intern., Inc.*, 769 F. Supp. 404, 407 (D. Mass 1990) ("[t]he standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act"). Here, FAB is actually using the trade secret and confidential information to unfairly compete with Aeronaut. As just one example, Mr. Holmes accessed four of Aeronaut's most successful beers and is using them at FAB. Friedlander Affidavit at ¶ 13. By starting with recipes with a proven track record for success gives FAB an unfair advantage.

Moreover, this misappropriation was a violation of Mr. Holmes's fiduciary and common law duties. As a shareholder in a close corporation, Mr. Holmes owed the Aeronaut and its shareholders a duty utmost good faith and loyalty. *See Donahue v. Rodd Electrotype Co. of New England*, 367 Mass. 578, 598 (1975). Moreover, as an officer who served on the Board of Managers, Mr. Holmes owed Aeronaut an independent duty of loyalty and care. *See Keros v. Massachusetts Mut. Life Ins. Co.*, 958 F. Supp. 2d 306, 310 (D. Mass. 2013) (quoting *Blackstone v. Cashman*, 860 N.E.2d 7, 17 (2007)). Mr. Holmes's theft of trade secrets was a violation of these duties. *See Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 220 (D. Mass.

---

[2] For similar reasons, Aeronaut is likely to succeed on its conversion and unjust enrichment claims.

2013) (finding the sufficiency of misappropriation of trade secrets claims established a prima facia case for breach of the duty of loyalty).  Likewise, Mr. Holmes breached his duties by founding a competing company, attempting to interfere with Aeronaut social media accounts, usurping Aeronaut corporate opportunities, and interfering with Aeronaut's advantageous business relations, among other activities.

Aeronaut is also likely to succeed on the merits of its trade dress claim.  "In order for trade dress to be protected under § 43(a), a plaintiff must prove that the dress is: (i) used in commerce; (ii) non-functional; and (iii) distinctive.  Finally, to prove infringement of protected trade dress, the plaintiff must show that another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source." *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 38 (1st Cir. 2001); *see also Smartling, Inc. v. Skawa Innovation Ltd.*, 358 F. Supp. 3d 124, 145–46 (D. Mass. 2019).

Here, FAB copied Aeronaut's labels, which include an unusual font and other unique design features that no other beer company uses.  Friedlander Affidavit at ¶¶ 14-15.  FAB's cans also include a UPC Aeronaut purchased and is using on its own beer cans which are still on retailer shelves.  Friedlander Affidavit at ¶ 16.  Not only do these similarities risk customer confusion, but Aeronaut has evidence of actual confusion.  For example, a convenience store in Middleton, Massachusetts posted a picture of a FAB can to social media incorrectly assuming FAB was somehow related to Aeronaut, which it is not.  Friedlander Affidavit at ¶¶ 19-20.  Moreover, Aeronaut is aware of at least four retailers who sell Aeronaut beer and several customers indicating that they are confused about FAB's affiliation with Aeronaut. *Id.*  By masquerading as Aeronaut, the Defendants are also tortiously interfering with Aeronaut's contractual and advantageous business relations.

### b. **Aeronaut Is Likely to Suffer Immediate and Irreparable Harm Absent a Preliminary Injunction**

Although a plaintiff must normally demonstrate the likelihood of irreparable harm to obtain injunctive relief "[w]hen a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." *EchoMail, Inc. v. Am. Express Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005). "That is in recognition of the fact that, 'once the trade secret is lost, it is gone forever.'" *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984)).

Even in the absence of a legal presumption, the threat of lost market share and customer defections are sufficient to establish irreparable harm. *Optos, Inc.*, 777 F. Supp. 2d at 241 (citing *Schawbel Corp. v. Conair Corp.*, 122 F.Supp.2d 71, 83-84 (D. Mass. 2000) ("[e]ven apart from the presumption of irreparable harm, the loss of market share and business relationships due to infringement may independently constitute harm.")). Indeed, irreparable harm is frequently found to exist in cases involving misappropriation of trade secrets and unlawful competition because the threat of damage to the plaintiff's business cannot be easily measured or compensated by money damages. *See Ethicon Endo-Surgery, Inc. v Pemberton*, No. 10-3973-B, 2010 WL 7926204 (Mass. Super. Oct. 27, 2010); *Optos Inc.*, 777 F. Supp. 2d at 241 (D. Mass. 2011) (finding irreparable harm where damages associated with loss of future customers to competitor "may escape accurate measurement").

Here, Aeronaut has established a likelihood of success on its misappropriation of trade secrets and confidential information claim as well as its other claims. Accordingly, irreparable harm is presumed. *EchoMail, Inc.*, 378 F. Supp. 2d at 4. Moreover, the risk of customer confusion caused by the Defendants' trade dress infringement risks irreparable harm to

Aeronaut's reputation. For example, at least one customer was dissatisfied with a FAB beer, which would harm Aeronaut's reputation if that customer confused an inferior FAB product with Aeronaut's beer. Friedlander Affidavit at ¶ 20. Likewise, Defendants will damage Aeronaut's customer good will if they use Aeronaut's customer lists to improperly solicit its customers. Moreover, due to the politically charged and highly partisan nature of FAB's labels, there is a clear risk that brand confusion could alienate many of Aeronaut's existing customers.

### c. The Balance of the Harms Favors Aeronaut

The balance of harms tilts strongly in favor of Aeronaut. The preliminary injunctive relief here is narrowly tailored to prevent the Defendants' continued improper use of and access to Aeronaut's trade secrets and confidential information, and to prevent the further development and distribution of a competing product derived from them. Moreover, the injunction would limit any additional customer confusion caused by the Defendants' trade dress and unfair competition violations and prevent the destruction of customer good will if the Defendants use Aeronaut's customer lists to market to Aeronaut's customers. On the other hand, the Defendants will not be harmed at all by an injunction here because they will be prohibited only from doing something the law forbids.

### d. Granting the Injunction Is in the Public Interest.

"A preliminary injunction is not appropriate unless there is 'a fit (or lack of friction) between the injunction and the public interest.'" *Optos, Inc.*, 777 F. Supp. 2d at 241-242 (internal citation omitted). Massachusetts public policy affords strong protections for trade secrets. *See Jet Spray Cooler*, 377 Mass. 159, 166 n. 8 (1979). Indeed, Massachusetts's trade secrets statute expressly provides for injunctive relief for actual or threatened misappropriation, based on prior party conduct and circumstances of potential use upon a showing that information qualifying as a

trade secret has been or is threatened to be misappropriated. M.G.L. c. 93, § 42A. There are similarly strong protections for those who engage in unfair and deceptive practices while engaged in trade or commerce. *See* M.G.L. c. 93A, § 11.

Here, Aeronaut seeks to protect its trade secrets and confidential information from the likely consequences of the Defendants' misappropriation. This misappropriation not only violated Defendants' common law and statutory obligations not to improperly obtain or benefit from a trade secret, but also their obligation to refrain from unscrupulous business practices. Accordingly, the preliminary injunction in this case is not only consistent with the public interest, but will further Massachusetts public policy.

## **Conclusion**

For the reasons set forth above, Aeronaut requests the Court grants it Motion for a Temporary Restraining Order and Preliminary Injunction.

>TBD BREWING LLC (D/B/A AERONAUT BREWING CO.),
>
>By its attorneys,
>
>/s/Lindsay M. Burke
>Michael P. Sams, Esq., BBO# 567812
>mpsams@kslegal.com
>Lindsay M. Burke, Esq., BBO# 674808
>lmburke@kslegal.com
>Alexander R. Zwillinger, Esq. BBO# 687078
>KENNEY & SAMS, P.C.
>Reservoir Corporate Center
>144 Turnpike Road, Suite 350
>Southborough, Massachusetts 01772
>Tel. 508-490-8500

Dated: January 15, 2020