UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TBD BREWING LLC (D/B/A AERONAUT BREWING CO.),<br><br>     Plaintiff,<br><br>v.<br><br>BENJAMIN HOLMES and FERMENTATION ARTS BRASSERIE, LLC<br><br>    Defendants. | Case No. 1:20-cv-10072-WGY |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants Benjamin Holmes (hereinafter "Holmes") and Fermentation Arts Brasserie, LLC (hereinafter "FAB"), collectively the "Defendants", hereby oppose Plaintiff TBD Brewing LLC's Motion for Temporary Restraining Order and Preliminary Injunction on the grounds stated herein, and request this Honorable Court to deny said motion.

In addition, Defendants hereby move the Honorable Court to issue a Temporary Restraining Order and Preliminary Injunction against Plaintiff to order Plaintiff to:

A. Forward to Defendant Holmes his personal emails which are archived in Plaintiffs email system; and

B.  Forward to Defendant Holmes archives of his past communications and personal

documents and records with an exported Google Drive archive of files owned by

Defendant Holmes on Google Apps, and Gmail ".mbox" backup, which are in possession

of Plaintiff.

Please see the Affidavit of Benjamin Holmes in Support of Defendants' Opposition to

Plaintiff TBD Brewing LLC's Motion for Temporary Restraining Order and Preliminary

Injunction and Defendants' Motion for Temporary Restraining Order and Preliminary

Injunction against Plaintiff which was filed herewith.


Defendants hereby state as follows:


## HISTORY

1.  Defendant Holmes, Daniel Rassi ("Rassi") and Ronn Friedlander ("Friedlander") co-

    founded, and were the managers of, Plaintiff as a brewery business in 2013, which makes

    the Aeronaut brand of beers.  See Certificate of Organization and Amended Certificate of

    Organization, copies of which are collectively filed herewith as Exhibit A.

2.  The Third Amendment to Limited Liability Company Operating Agreement effective

    June 6, 2016, along with the Amended and Restated Limited Liability Company

    Operating Agreement effective October 27, 2015, redacted copies of which are filed

    herewith as Exhibit B and constitute the current version of the Operating Agreement of

    the Company, upon Defendants' information and belief.

3.  Defendant Holmes, Rassi and Friedlander had run Plaintiff as the managers, with

    Defendant Holmes as President and CEO.  Family and friends of the managers make up

some of the members of Plaintiff; and, with the managers, make up most of the percentage interest in Plaintiff.  The managers had run Plaintiff.

4.  For about the past two years, it is Defendant Holmes' belief that Rassi and Friedlander have been attempting to force Defendant Holmes out of Plaintiff as a manager.

5.  Defendant Holmes alleged that Rassi and Friedlander wronged Defendant Holmes by actions involving breach of contract, defamation, improper release of Defendants Holmes' confidential personal information, and attempting to freeze out Defendant Holmes from Plaintiff.

6.  On April 23, 2018, Defendant Holmes, Rassi and Friedlander agreed that Defendant Holmes, Rassi and Friedlander would enter into mediation.

7.  A mediation session was held on May 3, 2018 between Defendant Holmes, Rassi and Friedlander, with their counsel.

8.  Defendant Holmes went on leave from Plaintiff.

9.  In December 2019, Defendant Holmes and Plaintiff entered into a Buy Out Agreement which stated, in part, that Defendant Holmes would resign as a manger of Plaintiff as of January 1, 2020, and that a portion of his membership interest in Plaintiff would be purchased.

10. On December 23, 2019, shortly after the Buy Out Agreement and right before Christmas, Plaintiffs counsel sent a cease and desist letter to Defendant Holmes regarding some of the matters in Plaintiffs Complaint.  Plaintiff demanded compliance by December 26, 2019, the day after Christmas, including that Defendant Holmes close down Defendant FAB.  See Letter from Sofia S. Lingos, Esq. dated December 23, 2019, a copy of which is attached hereto as Exhibit C.

11. On December 26, 2019, Defendant Holmes' attorney sent a letter in response, pointing out that Plaintiffs Operating Agreement permits Defendant Holmes to operate a competing business such as Defendant FAB, specifically section 6.10, which reads:

> 6.10 *Other Activities.* Members, Managers and any Affiliates of any of them, may engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as directors, officers, stockholders, managers, members and general or limited partners of corporations, partnerships or other limited liability companies with purposes similar to those of the LLC. Neither the LLC nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom

See Exhibit B; <u>see also</u> Letter from Adam Dash, Esq. dated December 26, 2019, a copy of which is attached hereto as Exhibit D.

12. In said December 26, 2019 letter from Defendant Holmes' attorney, Defendant Holmes agreed to Plaintiffs main requests stated in the December 23, 2019 letter about returning his key, returning his cell phone, fixing the incorrect UPC symbols inadvertently placed on Defendant FAB's beer cans, and destroying any confidential material belonging to Plaintiff which was in his possession.  <u>See</u> Exhibits C and D.

13. On December 31, 2019, Plaintiffs counsel sent another letter raising many of the same issues and adding new ones about artwork and a tax levy.  <u>See</u> Letter from Sofia S. Lingos, Esq dated December 31, 2019, a copy of which is attached hereto as Exhibit E.

14. On January 2, 2020, two checks which were due under the Buy Out Agreement to be paid to Defendant Holmes were found slipped under the door of Defendant Holmes' attorney's office.  Also on January 2, 2020, Defendant Holmes' attorney wrote a reply letter stating that the checks had been received, again stating that Defendant Holmes would be complying with most of Plaintiffs requests, and asking that Defendant Holmes be given copies of personal which are archived in Plaintiffs email system, and asking for archives of his past communications and personal documents and records with an exported Google Drive archive of files owned by Defendant Holmes on Google Apps, and Gmail ".mbox" backup, which are in possession of Plaintiff.  Defendant Holmes also asked for documentation regarding the tax levy and artwork issues so that he could resolve them. See Letter from Adam Dash, Esq. dated January 2, 2020, a copy of which is attached hereto as Exhibit F.

15. Plaintiff did not reply to said January 2, 2020 letter, so Defendant Holmes' attorney called and left a voicemail for Plaintiffs attorney on January 14, 2020 asking why Plaintiff had not replied.

16. On January 15, 2020, Plaintiffs successor counsel called Defendant Holmes's counsel to say that Plaintiff had filed suit.

## ARGUMENT

17. Plaintiff now seeks a temporary restraining order and preliminary injunction essentially seeking Defendants to do things that the Defendants have either already done or were in

the process of doing.  As the matter was being resolved through counsel, there was no
need to file suit and cause Defendants to spend money defending this matter.

18. This has been an about two year long dispute between the founders of Plaintiff.  As such,
there is no emergency which would necessitate injunctive relief.  It is only now that
Defendant Holmes signed the Buy Out Agreement in December 2019 did Plaintiff start to
raise issues with Defendant FAB.

19. There is no prohibition on Defendant Holmes from operating Defendant FAB, nor is
there a noncompete restriction on Defendant Holmes.  In fact, Plaintiffs Operating
Agreement grants explicit permission for Defendant Holmes to create and operate
Defendant FAB.  See Exhibit B.

20. Defendants have not used Plaintiffs recipes.  Defendant Holmes accessed Plaintiffs
recipe database fairly regularly during his time working at Plaintiff to check on
ingredients for recipes for label purposes, etc.  Defendant Holmes did not copy Plaintiffs
recipes to create Defendant FAB's beers, which were developed in whole part
independent of Plaintiffs recipes. Three FAB recipes have been brewed so far. West
Coast IPAs called "Balloon Factory", and "Squid Pro Quo" were originally based off of a
base recipe, with permission, called "Embarrassment of Riches" from the Dorchester
Brewing Co.  Plaintiff has no recipes in its catalog which are identified as "West Coast
IPAs", nor to the best of Defendants' knowledge is the traditional West Coast "Chico"
yeast used in any of Plaintiffs pale ales.

21. Defendant FAB's cans say "West Coast Style", and the choice to move in a completely
new direction was deliberate, with the objective of differentiating Defendant FAB from
Plaintiff.

22. Defendant FAB's third recipe, called "Pilsner For Peace", was originally based off of the Dorchester Brewing Co.'s Pilsner design, as adapted by Defendant Holmes and used with permission.

23. At no time was any recipe information originating from Plaintiff transferred to the collaborators at Dorchester Brewing Co., or used in recipe design for Defendant FAB beers in any way.

24. In the letters from Plaintiffs counsel over the past few weeks, no mention was made of taking Plaintiffs recipes. See Exhibit C and E. Defendants were unaware that Plaintiff had such concern, which Plaintiff only raised for the first time in this action yesterday.

25. Defendants are willing to change the design of Defendant FAB's cans, if Plaintiff has an issue with them. Defendants do not agree that said labels are a violation of Plaintiff property, but Defendants are willing to resolve this issue. As such, there is no need for an injunction.

26. Defendants has requested to return of the cell phone, relabeled the UPC codes on cans to the extent possible, and destroyed confidential information of Plaintiff in Defendants' possession, so there is no need for an injunction in that regard, either.

27. Defendant Holmes has not used Plaintiffs event statistics, mailing list or information assets in any way in the formation or operation of Defendant FAB. As part of Defendant Holmes' role with Plaintiff, he has frequently, over the past six years, accessed this data in bulk for various reasons, related to analysis and statistics, for reporting purposes to track the success of Plaintiff, including various metrics related to repeat customer rate, engagement and retention. In point of fact, Defendant Holmes had been informed by

Rassi and Friedlander that Defendant Holmes would be allowed to download backups of Plaintiffs data in lieu of keeping a corporate "Google Apps" IT account.

28. Regarding the wrong UPC codes being used on Defendant FAB beers, it should be noted that mistakes like this are fairly common.  In fact, Plaintiff accidentally used a Down the Road Brewing Company UPC code on one of Plaintiffs beers, and allowed that product to remain on the shelves without a recall.  Conversely, Defendant FAB has taken actions to correct the erroneous inclusion of a Plaintiff UPC code on a Defendant FAB can label by relabeling all cans on the market and in distribution channels that Defendants could locate.  Some cans in transit could have escaped Defendants' attempts to correct the issue, and Defendants are willing to do so if those cans are pointed out to Defendants, as requested by Defendants in the recent letters  See Photograph of label with corrected UPC codes, attached hereto as Exhibit G, and see also Exhibits D and F.  Rather than point out the cans that need correction, Plaintiff filed suit.

29. Neither Defendant has intentionally or otherwise caused harm to Plaintiff in any way, shape or form, nor to the best of Defendants' knowledge have any of their actions caused any unintentional financial harm or damage to the reputation of Plaintiff.  Defendants have expediently corrected every small issue which has been brought up by Plaintiff and have been receptive to all further suggestions on a continuing basis.  See Exhibits D and F.

30. Defendant Holmes used his email and document accounts at Plaintiff for certain personal matters.  Plaintiff has locked Defendant Holmes out of the system, so that he cannot access said personal emails and documents.  Defendant Holmes asked for said emails and documents in the recent letters, but Plaintiff has failed to provide them, which is a

hardship to Defendant Holmes.  <u>See</u> Exhibits D and F.  Being personal documents, providing them to Defendant Holmes creates no harm to Plaintiff, but creates much harm to Defendant Holmes

## CONCLUSION

Plaintiff is seeking injunctive relief to have the Court order Defendants to do things that they have either already done or are now doing.  This is part of the two years long dispute between Rassi and Friedlander and Defendant Holmes.  There is no harm to Plaintiff, there is no emergency to act now, and there is no dispute because Defendants are not trying to harm Plaintiff in any way.

Defendants do ask that an injunction be issued against Plaintiff so that Defendant Holmes can have his personal emails and documents returned to him which are in Plaintiffs system, as Defendant Holmes has been locked out of said system.

Respectfully submitted by
Defendants' attorney,

_____
Adam Dash, Esq.  BBO#557239
Adam Dash & Associates
48 Grove Street, Suite 304
Somerville, MA 02144
(617) 625-7373
dash@adamdashlaw.com

## CERTIFICATE OF SERVICE

I, Adam Dash, attorney for Defendants Benjamin Holmes and Fermentation Arts Brasserie, LLC, hereby certify that the above document was served on Plaintiffs counsel by hand and via email on this January 16, 2020.

Adam Dash, Esq.   BBO#557239
Adam Dash & Associates
48 Grove Street, Suite 304
Somerville, MA 02144
(617) 625-7373
dash@adamdashlaw.com



## The Commonwealth of Massachusetts
## William Francis Galvin

Minimum Fee: $500.00

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, M A 02108-1512
Telephone: (617) 727-9640

### Certificate of Organization
(General Laws, Chapter )

**Federal Employer Identification Number:** <u>001097643</u> *(must be 9 digits)*

**1. The exact name of the limited liability company is:** **TBD BREWING LLC**

**2a. Location of its principal office:**

| | | | | |
|---|---|---|---|---|
| No. and Street: | <u>311 MASSACHUSETTS AVE.</u> | | | |
| City or Town: | <u>ARLINGTON</u> | State: <u>M A</u> | Zip: <u>02474</u> | Couno.y: <u>USA</u> |

**2b. Street address of the office in the Commonwealth at which the records will be maintained:**

| | | | | |
|---|---|---|---|---|
| No. and Street: | <u>311 MASSACHUSETTS AVE.</u> | | | |
| City or Town: | <u>ARLINGTON</u> | State: <u>M A</u> | Zip: <u>02474</u> | Couno.y: <u>USA</u> |

**3. The general character of business, and if the limited liability company is organized to render professional service, the service to be rendered:**
<u>FOOD AND BEVERAGE MANUFACTURING- BEER: PRIMARILY GRAIN, HOPS AND YEAST</u>

**4. The latest date of dissolution, if specified:**

**5. Name and address of the Resident Agent:**

| | |
|---|---|
| Name: | <u>UNITED STATES CORPORATION AGENTS, INC.</u> |
| No. and Street: | <u>IOI BILLERICA AVE., BLDG. 5, SUITE 204</u> |
| City or Town: | <u>NORTH BILLERICA</u>   State: <u>M A</u>   Zip: <u>01862</u>   Couno.y: <u>USA</u> |

I, <u>UNITED STATES CORPORATION AGENTS, INC.</u> resident agent of the above limited liability company, consent to my appointment as the resident agent of the above limited liability company pursuant to G. L. Chapter 156C Section 12.

**6. The name and business address of each manager, if any:**

| Title | Individual Name | Address (no PO Box) |
|---|---|---|
| | First, Mi- e, Last, x""-""""m' | Address, City or Town, State, Zip Code |

**7. The name and business address of the person(s) in addition to the manager(s), authorized to execute documents to be filed with the Corporations Division, and at least one person shall be named if there are no managers:**

| Title | Individual Name | Address (no PO Box) |
|---|---|---|
| | First, Middle, Last, Suffix | Address, City or Town, State, Zip Code |
| SOC SIGNATORY | VINCENT TURSI | 311 MASSACHUSETTS AVE. ARLINGTON, MA 02474 USA |

| SOC SIGNATᴏRY | BENJAMIN HOLMES | 311 MASSACHUSETTS AVE. ARLINGTON, MA 02474 USA |
|---|---|---|
| ;:-o-c_s_1G_N_A_T_o_RY~ | DANiE[ R | 311 M CHᴏSETTS VE ARLINGTON, MA 02474 U.A |

**8. The name and business address of the person(s) authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| REAL PROPERTY | VINCENT TURSI | 311 MASSACHUSETTS AVE.<br>ARLINGTON, MA 02474 USA |
| REAL PROPERTY | BENJAMIN HOLMES | 311 MASSACHUSETTS AVE.<br>ARLINGTON, MA 02474 USA |
| REAL PROPERTY | DANIEL RASSI | 311 MASSACHUSETTS AVE.<br>ARLINGTON, MA 02474 USA |

**9. Additional matters:**

**SIGNED UNDER THE PENALTIES OF PERJURY, this 17 Day of Jannary, 2013,**
**LEGALZOOM.COM, INC., A CALIFORNIA CORPORATION, IMELDA VASQUEZ, ASSISTANT**
**SECRETARY**

*(The certificate must be signed by the person forming the LLC.)*

© 2001 - 2013 Commonwealth of Massachusetts
AH Rights Reserved

# THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

January 17, 2013 07:16 AM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

MA SOC   Filing Number: 201332852930   Date: 4/5/2013 12:18:00 PM



# The Commonwealth of Massachusetts
## William Francis Galvin

Minimum Fee: $100.00

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

### Certificate of Amendment
(General Laws, Chapter )

Federal Employer Identification Number: __001097643__ (must be 9 digits)

The date of filing of the original certificate of organization: __1/17/2013__

1.a. Exact name of the limited liability company: __T B D   B R E W I N G   L L C__

1.b. The exact name of the limited liability company *as amended,* is: __T B D   B R E W I N G   L L C__

2a. Location of its principal office:
No. and Street:   __25 SPENCER AVE__
City or Town:   __SOMERVILLE__   State: __MA__   Zip: __02144__   Country: __USA__

3. As *amended,* the general character of business, and if the limited liability company is organized to render professional service, the service to be rendered:

4. The latest date of dissolution, if specified:

a : e and address     s     e     __RPORATION AGENTS, INC.__
No. and Street:   __IOI BILLERICA AVE., BLDG. 5, SUITE 204__
City or Town:   __NORTH BILLERICA__   State: __MA__   Zip: __01862__   Country: __USA__

6. The name and business address of each manager, if any:

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, ip.c.od |
|-------|------------|---------|
|  |  |  |

7. The name and business address of the person(s) in addition to the manager(s), authorized to execute documents to be filed with the Corporations Division, and at least one person shall be named if there are no managers.

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|-------|------------|---------|
| SOC SIGNATORY | RONN FRIEDLANDER | 25 SPENCER AVE<br>SOMERVILLE, MA 02144 USA |
| SOC SIGNATORY | BENJAMIN HOLMES | 25 SPENCER AVE<br>SOMERVILLE, MA 02144 USA |
| SOC SIGNATORY | DANIEL RASSI | 25 SPENCER AVE<br>SOMERVILLE, MA 02144 USA |

**8. The name and business address of the person(s) authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property:**



Title — First, Middle, Last, Suffix — Address, City or Town, State, Zip Code

REAL PROPERTY    BENJAMIN HOLMES    25 SPENCER AVE
SOMERVILLE, MA 02144 USA

**9. Additional matters:**

**10. State the amendments to the certificate:**
LOCATION OF THE PRINCIPAL OFFICE SHALL BE: 25 SPENCER AVE., SOMERVILLE, MA 02144
PLEASE REMOVE: VINCENT TURSI, 311 MASSACHUSETTS AVE., ARLINGTON, MA 02474 THE
ADDRESS OF BENJAMIN HOLMES AND DANIEL RASSI SHALL BE: 25 SPENCER AVE.,
SOMERVILLE, MA 02144 PLEASE ADD THE FOLLOWING PERSON: RONN FRIEDLANDER, 25
SPENCER AVE., SOMERVILLE, MA 02144

**11. The amendment certificate shall be effective when filed unless a later effective date is specified:**

**SIGNED UNDER THE PENALTIES OF PERJURY,** this **5 Day of** April, 2013,
DANIEL RASSI , Signature **of** Authorized Signatory.

© 2001 ♦2013 Commonwealth of Massachusetts
All Rights Reserved

MA SOC   Filing Number: 201332852930     Date: 4/5/2013 12:18:00 PM

## TIIB COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

April 05, 201312:18 PM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT

### TBD BREWING LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT of TBD Brewing LLC (the "LLC"), is entered into and shall be effective as of October 27, 2015, by and among the persons identified as Members on *Schedule A* (each such person being individually referred to as a "Member" and all such persons being referred to collectively as the "Members"), and each of the persons identified as Managers on *Schedule A,* hereto (each such person being individually referred to as a "Manager" and all such persons being referred to collectively as the "Managers").

WHEREAS, pursuant to the Agreement, dated as of September 27, 2013 (the "Existing Operating Agreement"), among the persons identified as Original Members and Original Managers on *Schedule B* (collectively, the "Original Members"), the Company was originally formed under the Massachusetts Limited Liability Company Act (the "Act") by the filing on January 17, 2013 of a Certificate of Organization (the "Certificate") in the office of the Secretary of State of the Commonwealth of Massachusetts; and

WHEREAS, the Managers and the Members wish to set out fully their respective rights, obligations and duties with respect to the LLC and its business, management and operations; and

WHEREAS, the Original Members desire to admit Additional Members upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree that the Existing Operating Agreement is hereby amended and restated in its entirety as follows:

### ARTICLE I
### Definitions

The following capitalized terms used in this Agreement shall have the respective meanings ascribed to them below.

*"Act"* means the Massachusetts Limited Liability Company Act, in effect at the time of the initial filing of the Certificate with the office of the Secretary of State of the Commonwealth of Massachusetts, and as thereafter amended from time to time.

*"Additional Members"* means those persons admitted as Members of the LLC upon execution of this Agreement and are now reflected on Schedule A with the exception of those Members also included on Schedule B.

*"Acijusted Capital Account"* means, for each Member, such Member's Capital Account balance increased by such Member's share of "minimum gain" and of "partner nonrecourse debt minimum gain" (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

*"Affiliate"* shall mean, with respect to any specified person or entity, (i) any person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified person or entity; (ii) any person or entity that directly or indirectly controls 10 percent or more of the outstanding equity securities of the specified entity or of which the specified person or entity is directly or indirectly the owner of 10 percent or more of any class of equity securities; (iii) any person or entity that is an officer of, director of, manager of, partner in, or trustee of, or serves in a similar capacity with respect to, the specified person or entity or of which the specified person or entity is an officer, director, partner, manager or trustee, or with respect to which the specified person or entity serves in a similar capacity; or (iv) any person that is a member of the Immediate Family of the specified person.

*"Agreement"* means this Amended and Restated Limited Liability Company Operating Agreement, as originally executed and as amended from time to time, as the context requires.

*"Bankruptcy"* means the occurrence of any of the following events:

(i) a Member makes an assignment for the benefit of creditors;

(ii) a Member files a voluntary petition in bankruptcy;

(iii) a Member is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding;

(iv) a Member files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v) a Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature;

(vi) a Member seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of his or her properties; or

(vii) 120 days after the commencement of any proceeding against a Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if, within 90 days after the appointment without its consent or acquiescence of a trustee, receiver or liquidator of the Member or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

*"Board of Managers"* or *"Board"* means the Board of Managers described in Article VI of this Agreement.

*"Capital Account"* means a separate account maintained for each Member and adjusted in accordance with Treasury Regulations under I.R.C. § 704. To the extent consistent with such Treasury Regulations, the adjustments to such accounts shall include the following:

(i) There shall be credited to each Member's Capital Account the amount of any cash (which shall not include imputed or actual interest on any deferred contributions) actually contributed by such Member to the capital of the LLC, the fair market value (without regard to I.R.C.

§ 7701(g)) of any property contributed by such Member to the capital of the LLC, the amount of liabilities of the LLC assumed by the Member or to which property distributed to the Member was subject, and such Member's share of the Net Profits of the LLC and of any items in the nature of income or gain separately allocated to the Members, and there shall be charged against each Member's Capital Account the amount of all cash distributions to such Member, the fair market value (without regard to I.R.C. § 7701(g)) of any property distributed to such Member by the LLC, the amount of liabilities of the Member assumed by the LLC or to which property contributed by the Member to the LLC was subject, and such Member's share of the Net Losses of the LLC and of any items in the nature of loss or deduction separately allocated to the Members.

(ii) In the event any interest in the LLC is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

*"Capital Transaction"* means a sale or other disposition of all or a portion of the LLC's property in a single transaction or in a series of related transactions, other than such a sale or disposition in the ordinary course of the LLC's business and any refinancing.

*"Carrying Value"* means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, *provided, however,* that (i) the initial Carrying Value of any asset contributed to the LLC shall be adjusted to equal its gross fair market value (as determined by the Board of Managers, with reference to appropriate outside objective standards [e.g., Kelly Blue Book value for an automobile] if the Board, in its sole discretion, deems necessary) at the time of its contribution and (ii) the Carrying Values of all assets held by the LLC shall be adjusted to equal their respective gross fair market values (taking I.R.C. § 7701(g) into account) upon an election by the LLC to revalue its property in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and upon liquidation of the LLC. The Carrying Value of any asset whose Carrying Value was adjusted pursuant to the preceding sentence thereafter shall be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

*"Certificate"* means the Certificate of Organization creating the LLC, as it may, from time to time, be amended in accordance with the Act.

*"Clerk"* means the persons occupying the office of Clerk (as provided in Section 6.04) at any time, or from time to time.

*"Consent"* means the written consent or approval of more than 50 percent in interest, based on Percentage Interests, of those Members entitled to participate in giving such Consent, and if more than one class or group of Members is so entitled, then more than 50 percent shall be so required with respect to each such class or group.

*"Distributable Cash"* means, with respect to any fiscal period, the excess of all cash receipts of the LLC from any source whatsoever, including normal operations, sales of assets, proceeds of borrowings, capital contributions of the Members, proceeds from a Capital Transaction, and any and all other sources over the sum of the following amounts:

(i) cash disbursements for advertising and promotion expenses, salaries, employee benefits (including profit sharing, bonus and similar plans), fringe benefits, accounting and bookkeeping

services and equipment, costs of sales of assets, utilities, rental payments with respect to equipment or real property, management fees and expenses, insurance, real estate taxes, legal expenses, costs of repairs and maintenance, and any and all other items which are customarily considered to be "operating expenses";

(ii) payments of interest, principal and premium and points and other costs of borrowing under any indebtedness of the LLC, including, without limitation, (A) any mortgages or deeds of trust encumbering the real property or other assets owned or leased by the LLC and (B) any Voluntary Loans;

(iii) payments made to purchase inventory or capital assets and for capital construction, rehabilitation, acquisitions, alterations and improvements; and

(iv) amounts set aside as reserves for working capital, contingent liabilities, replacements or for any of the expenditures described in clauses (i), (ii) and (iii), above, which are deemed by the Board of Managers to be necessary to meet the current and anticipated future needs of the LLC.

*"Immediate Family"* (i) with respect to any individual, means his or her ancestors, spouse, issue, spouses of issue, any trustee or trustees, including successor and additional trustees, principally for the benefit of any one or more of such individuals, and any entity or entities all of the beneficial owners of which are such trusts and/or such individuals, but (ii) with respect to a legal representative, means the Immediate Family of the individual for whom such legal representative was appointed and (iii) with respect to a trustee, means the Immediate Family of the individuals who are the principal beneficiaries of the trust.

*"Invested Capital"* means, at any point in time, for any Member, the excess of (i) the aggregate amount of the capital contributed to the LLC by such Member over (ii) the aggregate amount distributed (or deemed distributed) to such Member pursuant to Section 4.01(b).

*"I.R.C."* means the Internal Revenue Code of 1986, as amended from time to time.

*"Legal Representative"* means, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, personal representative or other legal representative appointed as a result of the death or incompetency of such an individual.

*"LLC"* means the limited liability company formed pursuant to the Certificate and this Agreement, as it may from time to time be constituted and amended.

*"Manager"* refers to any person named as a Manager in this Agreement and any person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such person's capacity as (and for the period during which such person serves as) a Manager of the LLC. "Managers" or "Board of Managers" shall refer collectively to all of such persons in their capacities as (and for the period during which such persons serve as) Managers of the LLC.

*"Member"* refers severally to any person named as a Member in this Agreement and any person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in such person's capacity as a Member of the LLC. "Members" shall refer collectively to all such

persons in their such capacities as Members.

*"MemberManager"* means any Member who is also a Manager.

*"Net Profits"* and *"Net Losses"* mean the taxable income or loss, as the case may be, for a period as determined in accordance with I.R.C. § 703(a) computed with the following adjustments:

(i) items of gain, loss and deduction shall be computed based upon the Carrying Values of the LLC's assets (in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(g) and/or 1.704-3(d)) rather than upon the assets' adjusted bases for federal income tax purposes;

(ii) any tax-exempt income received by the LLC shall be included as an item of gross income;

(iii) the amount of any adjustment to the Carrying Value of any LLC asset pursuant to I.R.C. § 734(b) or I.R.C. § 743(b) that is required to be reflected in the Capital Accounts of the Members pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) shall be treated as an item of gain (if the adjustment is positive) or loss (if the adjustment is negative), and only such amount of the adjustment shall thereafter be taken into account in computing items of income and deduction;

(iv) any expenditure of the LLC described in I.R.C. § 705(a)(2)(B) (including any expenditures treated as being described in I.R.C. § 705(a)(2)(B) pursuant to Treasury Regulations under I.R.C. § 704(b)) shall be treated as a deductible expense;

(v) the amount of items of income, gain, loss or deduction specially allocated to any Members pursuant to Section 5.02 shall not be included in the computation;

(vi) the amount of any unrealized gain or unrealized loss attributable to an asset at the time it is distributed in kind to a Member shall be included in the computation as an item of income or loss, respectively; and

(vii) the amount of any unrealized gain or unrealized loss with respect to the assets of the LLC that is reflected in an adjustment to the Carrying Values of the LLC's assets pursuant to clause (ii) of the definition of "Carrying Value" shall be included in the computation as items of income or loss, respectively.

*"Percentage Interest"* shall be the percentage interest of a Member set forth in *Schedule A*, as amended from time to time, and subject to adjustment pursuant to Section 3.02.

*"President"* means the person occupying the office of President (as provided in Section 6.04) of the LLC at any time, or from time to time.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Supermajority Consent"* means the written consent or approval of both (i) all Managers of the LLC, and (ii) more than 50 percent, of non-manager Members, with each non-manager Member having a single vote.

*"Target Balance"* means, for each Member at any point in time, either (i) a positive amount equal to the net amount, if any, the Member would be entitled to receive or (ii) a negative

amount equal to the net amount the Member would be required to pay or contribute to the LLC or to any third party, assuming, in each case, that (A) the LLC sold all of its assets for an aggregate purchase price equal to their aggregate Carrying Value (assuming for this purpose only that the Carrying Value of any asset that secures a liability that is treated as "nonrecourse" for purposes of Treasury Regulation Section 1.1001-2 is no less than the amount of such liability that is allocated to such asset in accordance with Treasury Regulation Section 1.704-2(d)(2)); (B) all liabilities of the LLC were paid in accordance with their terms from the amounts specified in clause (A) of this sentence; (C) any Member that was obligated to contribute any amount to the LLC pursuant to this Agreement or otherwise (including the amount a Member would be obligated to pay to any third party pursuant to the terms of any liability or pursuant to any guaranty, indemnity, or similar ancillary agreement or arrangement entered into in connection with any liability of the LLC) contributed such amount to the LLC; (D) all liabilities of the LLC that were not completely repaid pursuant to clause (B) of this sentence were paid in accordance with their terms from the amounts specified in clause (C) of this sentence; and (E) the balance, if any, of any amounts held by the LLC was distributed in accordance with Section 4.01 hereof.

*"Transfer"* and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way (whether voluntarily, involuntarily or by operation of law) as to any interest as a Member. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

*"Treasurer"* shall mean the person occupying the office of Treasurer (as provided in Section 6.04) of the LLC at any time, or from time to time.

*"Voluntary Loan"* shall mean a loan made pursuant to Section 3.05 of this Agreement.

## ARTICLE II
### General

2.01 *Name of the Limited Liability Company.* The name of the limited liability company formed hereby is TBD Brewing LLC (D/B/A Aeronaut Brewing Co.). The name of the LLC may be changed at any time, or from time to time, with the unanimous written approval of the Board of Managers and the consent of the Members.

2.02 *Office of the Limited Liability Company; Agent for Service of Process.* The address of the registered office of the LLC for purposes of Section 5 of the Act is 14 Tyler Street, Somerville, Massachusetts 02143. The name and address of the resident agent for service of process for the LLC is United States Corporation Agents, Inc., 101 Billerica Avenue, Building 5, Suite 204, North Billerica, Massachusetts 01862. The Board of Managers may establish places of business of the LLC within and outside the Commonwealth of Massachusetts, as and when required by the LLC's business and in furtherance of its purposes set forth in Section 2.04 hereof, and may appoint agents for service of process in all jurisdictions in which the LLC shall conduct business. The Board of Managers may cause the LLC to change, from time to time, its resident agent for service of process, or the location of its registered office in Massachusetts, *provided, however*, that the Board of Managers shall promptly notify all Members in writing of any such change.

2.03 *Organization.* The Board of Managers shall cause to be filed such certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the operation of a limited liability company in accordance with the laws of the Commonwealth of Massachusetts and any other jurisdictions in which the LLC shall conduct business, and shall continue to do so for so long as the LLC conducts business therein.

2.04 *Purposes and Powers.* The general character of the business of the LLC, as set forth in the Certificate, is to engage in the business of food and beverage manufacturing, including (but not exclusively) buying, acquiring, owning, selling, leasing, financing, disposing of, and otherwise dealing with interests in beverage manufacturing property, beverage manufacturing feedstock commodities, beverage manufacturing technology or equipment to engage in any activities directly or indirectly related or incidental thereto, and to engage in any other activities permitted by the laws of the Commonwealth of Massachusetts.

Subject to all other provisions of this Agreement, in furtherance of the conduct of its business, the LLC is hereby authorized to do as follows:

(a) to enter into, execute, modify, amend, supplement, acknowledge, deliver, perform and carry out contracts of any kind, including operating agreements of limited liability companies (whether as a member or manager), joint venture agreements, limited partnership and general partnership agreements, contracts with Affiliates, and including other contracts establishing business arrangements or organizations, necessary to, in connection with, or incidental to the accomplishment of the purposes of the LLC;

(b) to borrow money and issue evidences of indebtedness or guarantees in furtherance of any or all of the purposes of the LLC, and to secure the same by mortgages, pledges or other liens on the property of the LLC;

(c) to the extent that funds of the LLC are available therefor, to pay all expenses, debts and obligations of the LLC;

(d) to enter into or engage in any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the LLC, so long as said activities may be lawfully carried on or performed by a limited liability company under the laws of the Commonwealth of Massachusetts; and

(e) to take any other action not prohibited under the Act or other applicable law.

2.05 *Members.* The Members of the LLC are identified on *Schedule A* hereto. Additional Members may be admitted to the LLC (i) pursuant to and in accordance with Section 3.02(c) and Article VIII hereof or (ii) with Supermajority Consent of the LLC's Members, which approval shall specify the capital contribution, Percentage Interest, economic interest and any other rights and obligations of such additional Member. Such approval shall bind all Members. In connection with any such admission, this Agreement (including Schedule A) shall be amended to reflect the additional Member, its capital contribution, if any, its Percentage Interest, and any other rights and obligations of the additional Member.

2.06 *Designation of Managers.* The persons identified on *Schedule A* hereto as "Managers" are currently serving as the managers of the LLC. Managers shall be elected by the Members in

accordance with the provisions of Section 6.02, below. Any Manager may withdraw or be removed as a manager of the LLC and other persons may be added or substituted as Managers, only in the manner specified in Section 6.02, below.

2.07 *Managers as Members.* Any Manager may hold an interest in the LLC as a Member, and such person's rights and interest as a Manager shall be distinct and separate from such person's rights and interest as a Member.

2.08 *Liability of Members.* The liability of the Members for the losses, debts and obligations of the LLC shall be limited to the Members' capital contributions, *provided, however*, that under applicable law, the Members may, under certain circumstances, be liable to the LLC to the extent of previous distributions made to them in the event that the LLC does not have sufficient assets to discharge its liabilities. Without limiting the foregoing, (i) except as provided in Section 3.02(e) of this Agreement, no Member in his, her or its capacity as a Member (or, if applicable, as a Manager) shall have any liability to restore any negative balance in his, her or its Capital Account; and (ii) the failure of the LLC to observe any formalities or requirements relating to exercise of the LLC's powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members or Managers for liabilities of the LLC.

2.09 *Notices of Default.* Manager shall provide advanced written notice within sixty (60) days, or as soon as reasonably feasible, to any affected Member in an event where the LLC would be in default of any material obligation. No Non-Managing Member shall have any obligation to give notice of an existing or potential default of any obligation of the LLC to any of the Members, nor, subject to the provisions of Section 3.02(b), shall any Member or Manager be obligated to make any capital contributions or loans to the LLC, or otherwise supply or make available any funds to the LLC, even if the failure to do so would result in a default of any of the LLC's obligations or the loss or termination of all or any part of the LLC's assets or business.

2.10 *Investment Representations.* Each Member, by execution of this Agreement or an amendment hereto reflecting such Member's admission to the LLC, hereby represents and warrants to the LLC the following.

(a) It is acquiring an interest in the LLC for its own account for investment only, and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act, or any rule or regulation thereunder.

(b) It understands that (i) the interest in the LLC it is acquiring has not been registered under the Securities Act or applicable state securities laws and cannot be resold unless subsequently registered under the Securities Act and such laws, or unless an exemption from such registration is available; (ii) such registration under the Securities Act and such laws is unlikely at any time in the future and neither the LLC nor the Members or Managers are obligated to file a registration statement under the Securities Act or such laws; and (iii) the assignment, sale, transfer, exchange or other disposition of the interests in the LLC is restricted in accordance with the terms of this Agreement.

(c) It has had such opportunity as it has deemed adequate to ask questions of and receive answers from representatives of the LLC concerning the LLC, and to obtain from representatives of the

LLC such information that the LLC possesses or can acquire without unreasonable effort or expense, as is necessary to evaluate the merits and risks of an investment in the LLC.

(d) It has, either alone or with its professional advisers, sufficient experience in business, financial and investment matters to be able to evaluate the merits and risks involved in investing in the LLC and to make an informed investment decision with respect to such investment.

(e) It can afford a complete loss of the value of its investment in the LLC and is able to bear the economic risk of holding such investment for an indefinite period.

(f) If the Member is an entity, (i) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) it has full organizational power to execute and deliver this Agreement and to perform its obligations hereunder; (iii) its execution, delivery and performance of this Agreement have been authorized by all requisite action on behalf of the entity; and (iv) it has duly executed and delivered this Agreement.

ARTICLE III
Capital Contributions; Additional Financing

3.01 *Capital Accounts.* For each Member (and each permitted assignee), the LLC shall establish and maintain a separate Capital Account.

3.02 *Capital Contributions.*

(a) Each Member has contributed to the capital of the LLC the amount set forth opposite his, her or its name on *Schedule A*, attached hereto.

(b) If the Board of Managers determines at any time, or from time to time, that the LLC requires funds to carry out its purposes, conduct its business, meet its obligations or make any expenditure authorized by this Agreement, in excess of the amounts generated from the LLC's operations and the amounts specified on *Schedule A* hereto, and such funds are not available from third-party lenders on terms acceptable to the Board of Managers in its sole discretion, the Members may, but shall not be required to, contribute any such additional capital. Members electing to contribute such additional capital shall contribute such portions thereof as they may agree upon, or, if they are unable to agree, each such Member shall contribute a portion of the total amount required based on its Percentage Interest and the Percentage Interests of all other contributing Members.  If such capital calls are required, the LLC is required to furnish written notice (via paper and/or electronic formats) to all Members at least  thirty (30) calendar days prior to the LLC's need for said additional capital ("the Deadline"), as established by the Board of Managers. The Deadline date must also be included in such Member notice.  All Member capital contributions in response to a capital call must be provided to the LLC at least three days prior to the Deadline, unless the Board of Managers consents to permit contributions at a time closer to the Deadline.

In connection with any such contribution of additional capital by the Members, the Percentage Interests of the Members shall be modified as follows:

i.     In the event of an additional capital contribution, each Member's Percentage Interest will be diluted (or increased) post-contribution proportionately based on the value of

the sum of their respective pre-contribution interest in the LLC and the value of their additional contributions, divided by the LLC's post-contribution valuation (e.g., if Members A, B, and C each own one-third interests in a company valued at $90,000, each would own 33 1/3% of the company's assets, or $30,000 apiece. If Member C were to voluntarily contribute an additional $10,000 in capital, Members A, and B would each own a [($30,000 + $0) / ($90,000 + $10,000) = $30,000 / $100,000 =] 30% interest in the resulting entity, while Member C would own a [($30,000 + $10,000) / ($90,000 + $10,000) = $40,000 / $100,000 =] 40% interest), *unless* with Supermajority Consent the additional contribution's Percentage Interest value is otherwise defined by contract, in which case each Member's interest will be diluted (or increased) based on the sum of the percentage value of the interest purchased by the additional contribution and the percentage value of each Member's pre-contribution interest multiplied by the percentage of the entity remaining after the contractually-defined purchased interest has been allocated. (e.g., Member A and Member B each own 50% interests in an entity when Member A contributes capital in exchange for a contractually-defined 10% interest. Member A would have a [10% + (50% x [100%-10%]) = 10% + (50% x 90%) = 10% + 45% =] 55% ownership interest, while Member B would have a [0% + (50% x [100% - 10%]) = 0% + (50% x 90%) = 0% + (45%) =] 45% ownership interest).

This Agreement, including *Schedule A*, hereto, shall be amended to reflect any such adjustment of the Members' Percentage Interests; and each Member, and each person who is hereinafter admitted to the LLC as a Member, hereby consents to any such amendment and the modification of his, her or its Percentage Interest in the manner provided herein, and acknowledges that, in connection with any such amendment, such Member's Percentage Interest may be diluted.

(c) If the Members elect not to contribute additional capital pursuant to Section 3.02(b), the Board of Managers shall be permitted to obtain additional equity financing in the amount required, on such terms and conditions as it in its sole discretion deems appropriate, from third parties unaffiliated with any Member. In connection with any such admission of additional Members, the Percentage Interests of the Members shall be diluted proportionately, based on their respective Percentage Interests immediately prior to any such dilution. Without in any way limiting the foregoing, the interest of any third party admitted to the LLC pursuant to this Section 3.02(c) in the Net Profits, Net Losses and distributions of cash or property of any nature may have such priority or priorities in relationship to the interests therein of the other Members as the Board of Managers may in its sole discretion determine, provided that the relative priorities of the other Members in the Net Profits, Net Losses and cash distributions of any nature of the LLC shall not be altered as a result of the admission of any such investor.

Each Member, and each person who is hereinafter admitted to the LLC as a Member, hereby (i) consents to the admission of any such third party on such terms as the Board of Managers may determine (subject to the provisions of this Section 3.02(c)), and to any amendment to this Agreement that may be necessary or appropriate to reflect the admission of any such third party and the terms on which the third party invests in the LLC; and (ii) acknowledges that, in connection with any admission of any such person, such Member's interest in allocations of Net Profits and Net Losses and distributions of cash and property of the LLC, and net proceeds upon liquidation of the LLC, may be diluted or otherwise altered (subject to the provisions of this

Section 3.02(c)).

(d) Each Member hereby constitutes and appoints each person serving from time to time as a Manager, and each of them acting singly, and each partner or officer thereof as such Member's agent and attorney in fact for the purpose of amending this Agreement, including *Schedule A* hereto, in such manner as may be necessary or appropriate from time to time, to reflect the modifications of the Members' Percentage Interests pursuant to Section 3.02(b), and the admission of any additional Member pursuant to Section 3.02(c). Any such amendment, when prepared by said attorney in fact, shall be deemed a part of this Agreement and incorporated herein by reference, as of the effective date of such amendment, to the same extent as if attached hereto and incorporated herein by this reference on the date hereof. The power of attorney contained in this Section 3.02(d) is coupled with a membership interest and, therefore, is irrevocable and shall survive the death, dissolution, bankruptcy or incapacity of any Member.

(e) Upon liquidation of the interest of any MemberManager (including, for purposes of this Section 3.02(e) only, any Member who was at any time a MemberManager) in the LLC (including upon liquidation of the LLC), such MemberManager shall contribute to the capital of the LLC an amount equal to the lesser of (i) his or her negative Capital Account balance, if any (determined by assuming that all of the LLC's assets are sold at their respective fair market values on the date of the liquidation and all items of Net Profit, Net Loss and other items in the nature of income or loss that are separately allocated to the Members for the taxable period ending on such date are made), or (ii) the excess of (A) 1.01 percent of the total capital contributions of the other Members of the LLC multiplied by a fraction, the numerator of which is the Percentage Interest of such MemberManager and the denominator of which is the aggregate of the Percentage Interests of all MemberManagers over (B) the aggregate amount of capital previously contributed to the LLC by such MemberManager.

3.03 *No Withdrawal of Interest on Capital.* Except as otherwise provided in this Article III, no Member shall be obligated to contribute any additional capital to the LLC. Additionally, no Member shall be permitted to contribute any additional capital to the LLC unless approved by the Board of Managers' unanimous consent. No interest shall accrue on any contributions to the capital of the LLC, and no Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any other payment in respect of its interest in the LLC, including, without limitation, as a result of the withdrawal or resignation of such Member from the LLC, except as specifically provided in this Agreement.

3.04 *Third-Party Loans.* In the event that the LLC requires additional funds to carry out its purposes, conduct its business, meet its obligations, or make any expenditure authorized by this Agreement, the LLC may borrow funds from such third-party lender(s) on such terms and conditions as may be acceptable to the Board of Managers.

3.05 *Voluntary Loans.* In the event the LLC requires additional funds to carry out its purposes, conduct its business, meet its obligations or make any expenditure authorized by this Agreement, and additional funds are not available from third parties pursuant to Section 3.04 on terms acceptable to the Board of Managers in its sole discretion or from the Members or a third party pursuant to Section 3.02, any Member may, but shall not be obligated to, loan such funds to the LLC. Any loan made pursuant to this Section 3.05 (a "Voluntary Loan") shall be nonrecourse to the Members, shall be evidenced by a promissory note; shall be collateralized by such assets of

the LLC as the lending Member and the Board of Managers shall determine, shall not violate the LLC's other loan or contractual arrangements; shall bear interest, compounded monthly, at a rate of interest equal to the prime rate of interest announced from time to time by *The Wall Street Journal* shall be repaid out of the first funds available therefor after payment of LLC expenses to third parties and in any event prior to any distribution to any Member of Distributable Cash; and shall be due and payable in full on the third anniversary of the date on which any such loan is made. Nothing in this section shall be construed as limiting the Board of Managers' ability or discretion to negotiate different loan term lengths, interest rates, or other loan terms with a Member, pursuant to the Board of Managers' business judgment with Supermajority Consent.

ARTICLE IV
Cash Distributions

4.01 *Distribution of Distributable Cash and Net Proceeds upon Liquidation.* Except as provided in Section 9.02, Distributable Cash and net proceeds upon liquidation of the LLC shall be distributed to the Members, at such times and in such amounts as the Board of Managers may approve, as follows:

(a) first, to the Members simultaneously in proportion to their respective amounts of Invested Capital until the Invested Capital of each Member has been reduced to zero; and

(b) second, the balance, if any, to the Members in accordance with their Percentage Interests.

4.02 *Withholding and Other Taxes.* If the Board of Managers determines in good faith that there is a material possibility that the LLC may be obligated to pay (or collect and pay over) the amount of any tax with respect to any Member's share of any income or distributions from the LLC, the LLC shall pay (or collect and pay over) the amount of such tax to the appropriate taxing authority. Any amount so paid with respect to a Member shall reduce the amount of any distribution that the Member would otherwise be entitled to receive at the time of the payment. If the amount paid with respect to a Member exceeds the amount of distributions then payable to such Member, such excess shall be treated as a loan to the Member from the LLC, payable with interest at the rate of the prime rate of interest announced from time to time by *The Wall Street Journal* plus three percent (3%) within thirty (30) days after such time that the LLC makes payment to the appropriate taxing authority. If for any reason the amount of such loan is not timely paid, then such unpaid amount plus any accrued but unpaid interest thereon shall be set off against any future distributions to which such Member otherwise would have been entitled.

4.03 *Distribution of Assets in Kind.* No Member shall have the right to require the LLC to distribute any of its assets in kind. If any assets of the LLC are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Board of Managers. Any Member entitled to any interest in such assets shall, unless otherwise determined by the Board of Managers, receive separate assets of the LLC, and not an interest as a tenant in common with other Members entitled to any such asset being distributed.

4.04 *Tax Distributions.* Within ninety (90) days after the end of each calendar year, to the extent of any available cash on hand, the LLC shall distribute to each Member (any such distribution, a "Tax Distribution") an amount such that total distributions with respect to the calendar year recently ended are at least equal to the assumed federal, state and local income tax liability (such

liability, a "Tax Liability") incurred by such Member with respect to such Member's distributive share of the LLC's taxable net income for such taxable year. For purposes of the computation required by this Section 4.04, the taxable net income for a taxable year allocated to each Member shall be deemed to be reduced by any prior net loss allocated to such Member that was not previously taken into account under this sentence. Capital losses included in any such prior net losses shall be included in the computation only to the extent of subsequent capital gains. In calculating the amount of each Tax Distribution, the LLC shall assume that each Member is taxable at the highest combined effective federal and state income tax rate applicable to individuals under the I.R.C. and the laws of the state in which any Member of the LLC resides or where the LLC does business and which state has highest effective state income tax rate of all of the states in which any Members of the LLC reside or where the LLC does business, giving effect to the different tax rates attributable to different types of income earned by the LLC, and the deductibility of state taxes for federal income tax purposes. Any Tax Distribution shall be treated as an advance on the Member's rights to distributions under Section 4.01, and shall reduce the amount of the first such distributions on a dollar-for-dollar basis. To the extent of available cash on hand, the LLC may make advance Tax Distributions on a quarterly basis in the amounts estimated by the Members to represent the Members' liabilities for quarterly estimated taxes. Any such advance Tax Distributions shall similarly reduce the Members' rights to distributions under Section 4.01 (and to the amount of the annual distribution under this Section 4.04). If, as of the end of a taxable year, the aggregate advance Tax Distributions paid to a Member with respect to the Member's Tax Liability for such taxable year exceed the aggregate amount of Tax Distributions to which the Member is entitled for such taxable year, the Member shall promptly refund such excess to the LLC and any such refunded amount shall be treated as if it were never distributed.

ARTICLE V
Allocation of Net Profits and Net Losses

5.01 *Basic Allocations*.

(a) Except as provided in Section 5.02 (which shall be applied first), the Net Profits and Net Losses of the LLC from operations for any year (or other fiscal period) shall be allocated among the Members in accordance with their Percentage Interests.

(b) Except as provided in Section 5.02 (which shall be applied first), any Net Profits and Net Losses arising from a Capital Transaction or upon liquidation of the LLC shall be allocated to the Members in such proportions and in such amounts as may be necessary so that following such allocations, the Adjusted Capital Account balance of each Member equals such Member's then Target Balance.

(c) If the amount of Net Profits or Net Losses allocable to the Members pursuant to Section 5.01(b) for a period is insufficient to allow the Adjusted Capital Account balance of each Member to equal such Member's Target Balance, such Net Profits or Net Losses shall be allocated among the Members in such a manner as to decrease the differences between the Members' respective Adjusted Capital Account balances and their respective Target Balances in proportion to such differences.

5.02 *Regulatory Allocations*. Notwithstanding the provisions of Section 5.01 above, the following allocations shall be made in the following order of priority:

(a) Items of income or gain (computed with the adjustments contained in paragraphs (i), (ii), (iii), (vi) and (vii) of the definition of "Net Profits and Net Losses") for any taxable period shall be allocated to the Members in the manner and to the minimum extent required by the "minimum gain chargeback" provisions of Treasury Regulation Section 1.704-2(f) and Treasury Regulation Section 1.704-2(i)(4).

(b) All "nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2(b)(1)) of the LLC for any year shall be allocated to the Members in accordance with their respective Percentage Interests, *provided, however*, that nonrecourse deductions attributable to "partner nonrecourse debt" (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated to the Members in accordance with the provisions of Treasury Regulation Section 1.704-2(i)(1).

(c) Items of income or gain (computed with the adjustments contained in paragraphs (i), (ii), (iii), (vi) and (vii) of the definition of "Net Profits and Net Losses") for any taxable period shall be allocated to the Members in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

(d) In no event shall Net Losses of the LLC be allocated to a Member if such allocation would cause or increase a negative balance in such Member's Adjusted Capital Account (determined, for purposes of this Section 5.02(d) only, by increasing the Member's Adjusted Capital Account balance by the amount the Member is obligated to restore to the LLC pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) and decreasing it by the amounts specified in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6)).

(e) Except to the extent necessary to comply with Sections 5.02, 5.02(a) and 5.02(b) hereof, the interest of the MemberManagers, in the aggregate, in each item of Membership income, gain, loss, deduction or credit will be equal to at least 1 percent of each of those items at all times during the existence of the LLC. In the event that there is more than one MemberManager in a particular period, items allocable to the MemberManagers pursuant to this Section 5.02(e) for such period shall be allocated among them in proportion to their respective Percentage Interests.

(f) In the event that items of income, gain, loss or deduction are allocated to one or more Members pursuant to subsections (c), (d) or (e), above, subsequent items of income, gain, loss or deduction from operations will first be allocated (subject to the provisions of subsections (c), (d) and (e)) to the Members in a manner designed to result in each Member having a Capital Account balance equal to what it would have been if the original allocation of items pursuant to subsections (c), (d) or (e) had not occurred.

(g) Except as otherwise provided herein or as required by I.R.C. § 704, for tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Members in the same manner as are Net Profits and Net Losses, *provided, however*, that if the Carrying Value of any property of the LLC differs from its adjusted basis for tax purposes, then items of income, gain, loss, deduction or credit related to such property for tax purposes shall be allocated among the Members so as to take account of the variation between the adjusted basis of the property for tax purposes and its Carrying Value in the manner provided for under I.R.C. § 704(c).

5.03 *Timing of Allocations.* Allocations of Net Profits, Net Losses and other items of income, gain, loss and deduction pursuant to this Article V shall be made for each fiscal year of the LLC as of the end of such fiscal year; *provided, however*, that if the Carrying Values of the assets of the LLC are adjusted in accordance with clause (ii) of the definition of "Carrying Value," the date of such adjustment shall be considered to be the end of a fiscal year for purposes of computing and allocating such Net Profits, Net Losses and other items of income, gain, loss and deduction.

ARTICLE VI
Management

6.01 *Management of the LLC.* The business and affairs of the LLC shall be managed by or under the direction of a Board of Managers, who may exercise all of the powers of the LLC except as otherwise provided by law or this Agreement (including, without limitation, Section 6.06, below). In the event of a vacancy in the Board of Managers, the remaining Managers (except as otherwise provided by law) may exercise the powers of the full Board until the vacancy is filled.

All management and other responsibilities not specifically reserved to the Members in this Agreement shall be vested in the Board of Managers, and the Members shall have no voting rights except as specifically provided in this Agreement.

Each Manager shall devote such time to the affairs of the LLC as may be reasonably necessary for performance by the Manager of his, her or its duties hereunder, provided that such persons shall not be required to devote full-time to such affairs, unless his, her or its duties require full-time service.

Specifically, but not by way of limitation, and subject to the provisions of Section 6.06, the Board of Managers shall be authorized in the name and on behalf of the LLC, to cause the LLC to do all things necessary or appropriate to carry on the business and purposes of the LLC, including, without limitation, the following:

(i) to acquire by purchase, lease, exchange or otherwise; and to sell, finance, refinance, encumber and otherwise deal with, any real or personal property;

(ii) to borrow money and issue evidences of indebtedness; or to guarantee loans and to secure the same by mortgage, deed of trust, pledge or other lien on any assets or property of the LLC; and to pay, prepay, extend, amend or otherwise modify the terms of any such borrowings;

(iii) to employ executive, administrative and support personnel in connection with the business of the LLC; and to pay salaries, expense reimbursement, employee benefits, fringe benefits, bonuses and any other form of compensation or employee benefit to such persons and entities, at such times and in such amounts as may be determined by the Board of Managers in its sole discretion, to provide executive, administrative and support services in connection with the business of the LLC;

(iv) to hire or employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and operations of the LLC, and to pay fees, expenses, salaries, wages and other compensation to such persons;

(v) to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, on such terms as it may determine and on such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the LLC;

(vi) to determine the appropriate accounting method or methods to be used by the LLC;

(vii) to cause the LLC to make or revoke any of the elections referred to in I.R.C. §§ 108, 704, 709, 754 and 1017 or any similar provisions enacted in lieu thereof, and in any other section of the I.R.C.;

(viii) to establish and maintain reserves for such purposes and in such amounts as it deems appropriate from time to time;

(ix) to pay all organizational expenses, and general and administrative expenses of the LLC;

(x) to deal with, or otherwise engage in business with, or provide services to and receive compensation therefor from, any person who has provided or may in the future provide any services to, lend money to, sell property to, or purchase property from the LLC, including, without limitation, any Member or Manager;

(xi) to engage in any kind of activity, and to perform and carry out contracts of any kind necessary to, in connection with or incidental to the accomplishment of the purposes of the LLC;

(xii) to pay any and all fees and to make any and all expenditures that the Board of Managers, in its sole discretion, deems necessary or appropriate in connection with the organization of the LLC, the offering and sale of membership interests in the LLC, the management of the affairs of the LLC, and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, fees, reimbursements and expenditures payable to a Member or Manager;

(xiii) to exercise all powers and authority granted by the Act to managers, except as otherwise provided in this Agreement;

(xiv) to cause the LLC and its properties and assets to be maintained and operated in such a manner as the Board of Managers may determine, subject, however, to obligations imposed by applicable laws or by any mortgage or security interest encumbering the LLC and such properties and assets from time to time, and by any lease, rental agreement or other agreement pertaining thereto;

(xv) to cause to be obtained and continued in force all policies of insurance required by any mortgage, lease or other agreement relating to the LLC's business or any part thereof, or determined by the Board of Managers to be in the best interests of the LLC;

(xvi) to cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed on any of the assets of the LLC unless the same are contested by the LLC; and

(xvii) to perform any other act that the Board of Managers may deem necessary, convenient or desirable for the LLC or its business.

6.02 *Managers.*

(a) *Number, Election and Qualification.* The number of Managers who shall constitute the whole Board of Managers shall be determined by resolution of the Members or the Board of Managers, but in no event shall such number be less than three nor more than seven unless the Members specifically vote pursuant to Section 6.03(c) to cause the LLC to be Member-managed, in which case there shall be no Board of Managers. Subject to the preceding sentence, the number of Managers may be decreased at any time, and from time to time, either by the Members' unanimous written consent or by the unanimous vote of the Managers then in office, but only to eliminate vacancies existing by reason of the death, resignation, removal or expiration of the term of one or more Managers. The Managers shall be elected at an annual meeting of the Members by such Members as have the right to vote at such election. Managers need not be Members of the LLC.

The number of members of the Board of Managers is hereby initially fixed at three, and the persons identified as "Managers" on *Schedule A*, hereto, are currently serving as the Managers.

Each person elected to serve as a Manager of the LLC shall sign this Agreement, or a counterpart hereof or amendment hereto, or other writing pursuant to which such person (i) acknowledges receipt of a copy of this Agreement, as amended and in effect as of the date of such writing; (ii) agrees that he or she is a party to and is bound by this Agreement, including the power of attorney set forth below; (iii) agrees to perform the duties of a Manager hereunder; and (iv) agrees to execute and deliver such additional agreements, instruments, certificates and documents, including, without limitation, an amendment to the Certificate, which may be necessary, appropriate or convenient to reflect the foregoing matters and the election of such person as a Manager of the LLC.

Upon the death, resignation, removal or expiration of the term of any Manager (a "Terminated Manager"), (i) such Terminated Manager shall have no further authority as a Manager under this Agreement; (ii) such Terminated Manager shall have no further obligations or rights as a Manager under this Agreement (except for liabilities and rights accruing prior to the date of death, resignation, removal or expiration of his or her term, such as, for example, rights to indemnification under Section 6.09 that relate to actions or omissions occurring during such person's service as a Manager), and (iii) no writing or instrument shall be required to be executed by the LLC or the Terminated Manager to reflect such cessation of service, except that the Terminated Manager (or his or her legal representative or attorney in fact, as provided in the following paragraph) shall execute and deliver any agreement, instrument, certificate or document, including an amendment to the Certificate that may be reasonably required to reflect that the Terminated Manager is no longer a Manager of the LLC. In the event of two (2) or more Terminated Managers in any one year, financial compensation for any Manager elected to fill such vacancies shall be determined by the Board of Managers in their fiduciary capacity, with the approval of twenty-five (25%) percent of minority Members.

Each person now or hereafter serving as a Manager of the LLC, by execution of this Agreement, an amendment hereto or an instrument acknowledging that such person is bound hereby, hereby constitutes and appoints each other person who may, from time to time, be serving as a Manager, and each of them acting singly, such Manager's agent and attorney in fact for the purpose of executing and delivering any and all agreements, instruments and other documents (including,

without limitation, an amendment to the Certificate) as are necessary or appropriate to reflect that he, she or it is no longer a Manager of the LLC following the death, resignation, removal or expiration of the term of such Manager, which power of attorney is hereby agreed and acknowledged to be irrevocable, and shall survive the resignation, removal, expiration of the term, death, dissolution, bankruptcy or incapacity of any Manager until such time as the withdrawal of such Manager from the LLC has been reflected by all necessary or appropriate agreements, instruments and other documents.

(b) *Enlargement of the Board.* Subject to Section 6.02(a), above, the number of Managers may be increased at any time, and from time to time, by unanimous consent of either the voting Members or the Managers then in office.

(c) *Tenure.* Each Manager shall hold office until the next annual meeting and until his or her successor is duly elected and qualified, or until his or her earlier death, resignation or removal.

(d) *Vacancies.* Unless and until filled by the Members, any vacancy in the Board of Managers, however occurring, including a vacancy resulting from an enlargement of the Board, may be filled by vote of a majority of the Managers then in office, although less than a quorum, or by a sole remaining Manager. A Manager elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office, and a Manager, chosen to fill a position resulting from an increase in the number of Managers, shall hold office until the next annual meeting of Members and until his or her successor is duly elected and qualified, or until his or her earlier death, resignation or removal.

(e) *Resignation.* Any Manager may resign by delivering his or her written resignation to the LLC at its principal office or to the President or Clerk. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the occurrence of some other event.

(f) *Regular Meetings.* Regular meetings of the Board of Managers may be held without notice at such time and place, either within or outside the Commonwealth of Massachusetts, as shall be determined from time to time by the Board of Managers, provided that any Manager who is absent when such a determination is made shall be given notice of the determination. A regular meeting of the Board of Managers may be held without notice, immediately after and at the same place as the annual meeting of Members.

(g) *Special Meetings.* Special meetings of the Board of Managers may be held at any time and place, within or outside the Commonwealth of Massachusetts, designated in a call by the President (if appointed), two or more Managers, or by one Manager in the event that there is only a single Manager in office.

(h) *Notice of Special Meetings.* Notice of any special meeting of Managers shall be given to each Manager by the Clerk or by the officer or one of the Managers calling the meeting. Notice shall be duly given to each Manager (i) by giving notice to such Manager in person or by telephone at least 24 hours in advance of the meeting; (ii) by sending electronic notice via electronic mail (e-mail) or facsimile (FAX), or delivering written notice by hand, to the Manager's last known business or home address at least 24 hours in advance of the meeting; or (iii) by mailing written notice to the Manager's last known business or home address at least 72 hours in advance of the

meeting. A notice or waiver of notice of a meeting of the Board of Managers need not specify the purpose of the meeting.

(i) *Meetings by Telephone Conference Calls.* Managers, or any members of any committee designated by the Managers, may participate in a meeting of the Board of Managers or such committee by means of conference telephone or similar communications equipment, by means of which all persons participating in the meeting can hear each other, and participation by such means shall constitute presence in person at such meeting.

(j) *Quorum.* A majority of the total number of the whole Board of Managers shall constitute a quorum at all meetings of the Board of Managers. In the event that one or more of the Managers shall be disqualified to vote at any meeting, then the required quorum shall be reduced by one for each such Manager so disqualified, *provided, however*, that in no case shall less than one-third of the number so fixed constitute a quorum. In the absence of a quorum at any such meeting, a majority of the Managers present may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.

(k) *Action at Meeting.* At any meeting of the Board of Managers at which a quorum is present, the unanimous consent of all voting Managers is required to take any action unless a different vote is specified by law, the Certificate or this Agreement.

(l) *Action by Consent.* Any action required or permitted to be taken at any meeting of the Board of Managers, or of any committee of the Board of Managers, may be taken without a meeting, if all members of the Board or committee, as the case may be, consent to the action in writing, and the written consents are filed with the minutes of proceedings of the Board or committee.

(m) *Removal.* Except as otherwise provided by the Act, any one or more or all of the Managers may be removed, with or without cause, by Members holding a majority of the Percentage Interests then held by all Members, except that the Managers elected by the holders of a particular class or series of Members may be removed without cause only by a vote of Members holding a majority in Percentage Interest of such class or series.

(n) *Committees.* The Board of Managers may, by resolution unanimously passed by the Board's voting Managers, designate one or more committees, each committee to consist of one or more of the Managers of the LLC. The Board may designate one or more Managers as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members of the committee present at any meeting, and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Managers to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Managers and subject to the provisions of the Act, shall have and may exercise all the powers and authority of the Board of Managers in the management of the business and affairs of the LLC. Each such committee shall keep minutes and make such reports as the Board of Managers may from time to time request. Except as the Board of Managers may otherwise determine, any committee may make rules for the conduct of the committee's business, but unless otherwise provided by the Managers or in such rules, its business shall be conducted as nearly as possible in the same manner as is provided in this Agreement for the Board of Managers.

(o) *Compensation of Managers.* Managers may be paid such compensation for their services and such reimbursement for expenses of attendance at meetings as the Board of Managers may from time to time determine. No such payment shall preclude any Manager from serving the LLC or any of its parent or subsidiary entities in any other capacity and receiving compensation for such service. Compensation to Managers shall not include a bonus, in addition to his or her base compensation, until distributions have been made to the Additional Members equal to the amount of his or her Initial Capital Contributions as presented next to his or her name on this Schedule A.

6.03 *Members.*

(a) *Place of Meetings.* All meetings of Members shall be held at such place within or outside the Commonwealth of Massachusetts as may be designated from time to time by the Board of Managers or the President or, if not so designated, at the registered office of the LLC.

(b) *Annual Meeting.* There shall be held an annual meeting of Members for the election of Managers and for the transaction of such other business as may properly be brought before the meeting. Such annual meeting shall be held on a date to be fixed by the Board of Managers or the President (which date shall not be a legal holiday in the place where the meeting is to be held) at the time and place to be fixed by the Board of Managers or the President, and stated in the notice of the meeting. If no annual meeting is held in accordance with the foregoing provisions, a special meeting may be held in lieu of the annual meeting, and any action taken at that special meeting shall have the same effect as if it had been taken at the annual meeting, and, in such case, all references in this Agreement to the annual meeting of the Members shall be deemed to refer to such special meeting.

(c) *Right to Elect to be Member-Managed.* At any annual meeting (or any special meeting, as described in Section 6.03(d), below), the Members may elect (by Supermajority Consent of all voting Members) to cause the LLC to be managed by the Members. In connection with any such election, this Agreement shall be amended by the Members to reflect appropriate provisions regarding the management and operation of the LLC by the Members.

(d) *Special Meetings.* Special meetings of Members may be called at any time by the President or by the Board of Managers. Business transacted at any special meeting of Members shall be limited to matters relating to the purpose or purposes stated in the notice of meeting.

(e) *Notice of Meetings.* Except as otherwise provided by law, written notice of each meeting, whether annual or special, of Members, shall be given not less than 10 nor more than 60 days before the date of the meeting to each Member entitled to vote at such meeting. The notices of all meetings shall state the place, date and hour of the meeting. The notice of a special meeting shall state, in addition, the purpose or purposes for which the meeting is called. If mailed, notice is deemed given when deposited in the U.S. mail, postage prepaid, directed to the Member at his or her address as it appears on the records of the LLC.

(f) *Voting List.* The officer who has charge of the membership ledger of the LLC shall prepare, at least 10 days before every meeting of Members, a complete list, arranged in alphabetical order, of the Members entitled to vote at the meeting, that shows the address of each Member and such Member's Percentage Interest. Such list shall be open to the examination of any Member for any

purpose germane to the meeting, during ordinary business hours, for a period of at least 10 days prior to the meeting, at a place within the city where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time of the meeting, and may be inspected by any Member who is present.

(g) *Quorum.* Except as otherwise provided by law, the Certificate or this Agreement, the holders of a majority of the Percentage Interests of the LLC who are entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business.

(h) *Adjournments.* Any meeting of Members may be adjourned to any other time and to any other place at which a meeting of Members may be held under this Agreement by the Members present or represented at the meeting and entitled to vote, although less than a quorum; or, if no Member is present, by any officer entitled to preside at or to act as Clerk of such meeting. It shall not be necessary to notify any Member of any adjournment of less than 30 days if the time and place of the adjourned meeting are announced at the meeting at which adjournment is taken unless, after the adjournment, a new record date is fixed for the adjourned meeting. At the adjourned meeting, the LLC may transact any business that might have been transacted at the original meeting.

(i) *Voting and Proxies.* Each Member of record shall be entitled to vote at a meeting of Members, or to express consent or dissent to LLC action in writing without a meeting. A Member may vote or express such consent or dissent in person or may authorize another person or persons to vote or act for him or her by written proxy executed by the Member or his or her authorized agent and delivered to any officer of the LLC. No such proxy shall be voted or acted on after three years from the date of its execution unless the proxy expressly provides for a longer period.

(j) *Action at Meeting.* When a quorum is present at any meeting, the Members representing a majority of the total Percentage Interests of all Members entitled to vote (or, if there are two or more classes of Members entitled to vote as separate classes, then in the case of each such class, the holders of a majority of the total Percentage Interests of that class entitled to vote on such matter) shall decide any matter to be voted on by the Members at such meeting, except when a different consent standard is required by express provision of law, the Certificate or this Agreement.

(k) *Action Without Meeting.* Any action required or permitted to be taken at any annual or special meeting of Members of the LLC may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by the Members having not less than the minimum aggregate Percentage Interests that would be necessary to authorize or take such action at a meeting at which all Members to vote on such action were present and voted. Prompt notice of taking an action without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing.

(l) *Record Date.* The Board of Managers may fix in advance a date as a record date for the determination of the Members entitled to notice of or to vote at any meeting of Members or to express consent (or dissent) to LLC action in writing without a meeting, or entitled to receive payment of any distribution or allotment of any rights in respect of any change, conversion or

exchange of interests, or for the purpose of any other lawful action. Such record date shall not be more than 60 nor less than 10 days before the date of such meeting, nor more than 10 days after the date of adoption of a record date for a written consent without a meeting, nor more than 60 days prior to any other action to which such record date relates.

If no record date is fixed, the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the day before the day on which notice is given, or, if notice is waived, at the close of business on the day before the day on which the meeting is held. The record date for determining Members entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Managers is necessary, shall be the day on which the first written consent is properly delivered to the LLC. The record date for determining Members for any other purpose shall be at the close of business on the day on which the Board of Managers adopts the resolution relating to such purpose.

A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting, *provided, however*, that the Board of Managers may fix a new record date for the adjourned meeting.

(m) *Member Rights in Subsidiary.*  If the LLC directly funds a wholly or partially owned subsidiary or affiliated incubator program (the "Subsidiary"), Members shall have ownership interest in the Subsidiary in proportion to their existing Percentage Interest in the LLC.

6.04 *Officers.*

 (a) *Enumeration.* The officers of the LLC shall consist of a President, a Treasurer, a Clerk, and such other officers with such other titles as the Board of Managers shall determine, including a Chairman of the Board, a Vice-Chairman of the Board, and one or more Vice Presidents, Assistant Treasurers, and Assistant Clerks. The Board of Managers may appoint such other officers as it may deem appropriate.

(b) *Election.* The President, Treasurer and Clerk shall be elected annually by the Board of Managers at its first meeting following the annual meeting of Members. Other officers may be appointed by the Board of Managers at such meeting or at any other meeting.

(c) *Qualification.* No officer need be a Member or a Manager. Any two or more offices may be held by the same person.

(d) *Tenure.* Except as otherwise provided by law, by the Certificate or by this Agreement, each officer shall hold office until his or her successor is elected and qualified, unless a different term is specified in the vote choosing or appointing him or her, or until his or her earlier death, resignation or removal.

(e) *Resignation and Removal.* Any officer may resign by delivering his or her written resignation to the LLC at the LLC's principal office or to the President, Clerk or any Manager. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

Any officer may be removed at any time, with or without cause, by vote of a majority of the

entire number of Managers then in office (which entire number shall be determined exclusive of any officer who is the subject of the proposed removal).

Except as the Board of Managers may otherwise determine, no officer who resigns or is removed shall have any right to any compensation as an officer for any period following his or her resignation or removal, or any right to damages on account of such removal, whether his or her compensation be by the month or by the year or otherwise, unless such compensation is expressly provided in a duly authorized written agreement with the LLC.

(f) *Vacancies*. The Board of Managers may fill any vacancy occurring in any office for any reason and may, in its discretion, leave unfilled any office for such period as it may determine. Each such successor shall hold office for the unexpired term of his or her predecessor and until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.

(g) *Chairman of the Board and Vice-Chairman of the Board*. The Board of Managers may appoint a Chairman of the Board and may designate the Chairman of the Board as Chief Executive Officer. If the Board of Managers appoints a Chairman of the Board, he or she shall perform such duties and possess such powers as are assigned to him or her by the Board of Managers. If the Board of Managers appoints a Vice-Chairman of the Board, he or she shall, in the absence or disability of the Chairman of the Board, perform the duties and exercise the powers of the Chairman of the Board and shall perform such other duties and possess such other powers as may, from time to time, be vested in him or her by the Board of Managers.

(h) *President*. The President shall, subject to the direction of the Board of Managers, have general charge and supervision of the business of the LLC. Unless otherwise provided by the Board of Managers, he or she shall preside at all meetings of the Members, and, if he or she is a Manager, at all meetings of the Board of Managers. Unless the Board of Managers has designated the Chairman of the Board or another officer as Chief Executive Officer, the President shall be the Chief Executive Officer of the LLC. The President shall perform such other duties and shall have such other powers as the Board of Managers may, from time to time, prescribe.

(i) *Vice Presidents*. Any Vice President shall perform such duties and possess such powers as the Board of Managers or the President may, from time to time, prescribe. In the event of the absence, inability or refusal to act of the President, the Vice President (or if there shall be more than one, the Vice Presidents in the order determined by the Board of Managers) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President. The Board of Managers may assign to any Vice President the title of Executive Vice President, Senior Vice President or any other title selected by the Board of Managers.

(j) *Clerk and Assistant Clerks*. The Clerk shall perform such duties and shall have such powers as the Board of Managers or the President may, from time to time, prescribe. In addition, the Clerk shall perform such duties and have such powers as are incident to the office of the clerk of a corporation, including, without limitation, the duty and power to give notices of all meetings of Members and special meetings of the Board of Managers, to attend all meetings of Members and the Board of Managers and keep a record of the proceedings, to maintain a stock ledger and

prepare lists of Members and their addresses as required, and to be custodian of the LLC records.

Any Assistant Clerk shall perform such duties and possess such powers as the Board of Managers, the President or the Clerk may, from time to time, prescribe. In the event of the absence, inability or refusal to act of the Clerk, the Assistant Clerk (or if there shall be more than one, the Assistant Clerks in the order determined by the Board of Managers) shall perform the duties and exercise the powers of the Clerk.

In the absence of the Clerk or any Assistant Clerk at any meeting of Members or Managers, the person presiding at the meeting shall designate a temporary clerk to keep a record of the meeting.

(k) *Treasurer and Assistant Treasurers.* The Treasurer shall perform such duties and shall have such powers as may, from time to time, be assigned to him or her by the Board of Managers or the President. In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of the treasurer of a corporation, including, without limitation, the duty and power to keep and be responsible for all funds and securities of the LLC, to deposit funds of the LLC in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the Board of Managers, to make proper accounts of such funds, and to render as required by the Board of Managers statements of all such transactions and of the financial condition of the LLC.

The Assistant Treasurers shall perform such duties and possess such powers as the Board of Managers, the President or the Treasurer may, from time to time, prescribe. In the event of the absence, inability or refusal to act of the Treasurer, the Assistant Treasurer (or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Managers) shall perform the duties and exercise the powers of the Treasurer.

(l) *Salaries.* Officers of the LLC shall be entitled to such salaries, compensation or reimbursement as shall be fixed or allowed, from time to time, by the Board of Managers.

6.05 *Interpretation of Rights and Duties of Managers and Members.* To the fullest extent permitted by the Act and other applicable law, and to the extent not inconsistent with the specific provisions of this Agreement or the Certificate, it is the intention of the parties as follows:

(i) the Board of Managers shall have the power to do any and all acts, statutory and otherwise, with respect to the LLC that the board of directors of a Delaware corporation would have with respect to such Delaware corporation; and

(ii) the Members shall have no power or authority whatsoever with respect to the management of the business and affairs of the LLC, except as expressly stated in this Agreement.

6.06 *Member Approval Requirements.* Notwithstanding the provisions of Section 6.01 or any other provision of this Agreement to the contrary, without prior written Supermajority Consent, the Board of Managers shall not cause the LLC to (and the LLC shall not) take any of the following actions:

(i) sell all or substantially all of the assets of the LLC; and

(ii) cause the LLC to enter into any agreement or arrangement with any of the Managers or any

of their respective Affiliates (except for the arrangements described in Sections 6.02(o) above), pursuant to which any Manager or any of such Affiliates is to receive compensation of any kind, unless such agreement or arrangement is approved by the disinterested members of the Board of Managers' via unanimous consent.

6.07 *Binding the LLC*. Except as the Board of Managers may generally or in any particular case or cases otherwise authorize, and subject to the other provisions of this Agreement and the Certificate, all deeds, leases, contracts, bonds, notes, checks, drafts or other obligations made, accepted or endorsed by the LLC shall be signed by any Manager, the Chairman of the Board, if any, the President, any Vice President or the Treasurer, or any of them acting singly.

6.08 *Contracts with Members*. Subject to the provisions of Section 6.06(ii), with the unanimous approval of disinterested Managers in each case, the LLC may engage in business with, or enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the LLC of goods, services or space with any Member or Affiliate of a Member, and may pay compensation in connection with such business, goods, services or space, provided in each case that the amounts payable thereunder are reasonably comparable to those that would be payable to unaffiliated persons under similar agreements; and, if the Board of Managers determines in good faith that such amounts are so comparable, such determination shall be conclusive absent manifest error.

6.09 *Indemnification and Exculpation*.

(a) No Manager or its Affiliates shall have any liability to the LLC or to any Member for any loss suffered by the LLC that arises out of any action or inaction of any Manager or its Affiliates if such Manager or its Affiliates, as the case may be, in good faith, determined that such course of conduct was in the best interests of the LLC and such course of conduct did not constitute gross negligence or willful misconduct of such Manager or its Affiliates.

(b) The Members' respective obligations to each other are limited to the express obligations described in this Agreement, which obligations the Members shall carry out with ordinary prudence and in a manner characteristic of businesspersons in similar circumstances. No Member shall be a fiduciary of or have any fiduciary obligations to the other Members in connection with the LLC or this Agreement or such Member's performance of its obligations under this Agreement, and each Member hereby waives to the fullest extent permitted by applicable law any rights it may have to claim any breach of fiduciary obligation under this Agreement or in connection with the LLC.

(c) Each Manager and its Affiliates shall be indemnified by the LLC against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by it with respect to actions taken by such Manager or its Affiliates on behalf of the LLC, provided that no indemnification shall be provided for any person with respect to any matter as to which he or she shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his or her action was in the best interest of the LLC. Without limiting the foregoing, the Board of Managers may elect (on a case-by-case basis) to permit such indemnification to include payment by the LLC of expenses incurred in defending a civil or criminal action or proceeding in advance of the final disposition of such action or proceeding, upon receipt of an undertaking by the person indemnified to repay such payment if he or she shall be adjudicated

not to be entitled to indemnification under this Section 6.09, which undertaking may be accepted without reference to the financial ability of such person to make repayment. Any indemnification to be provided hereunder may be provided even if the person to be indemnified is no longer a Manager or an Affiliate of a Manager.

(d) Any indemnity under this Section 6.09 shall be paid from, and only to the extent of, LLC assets, and no Member shall have any personal liability on account thereof. The LLC shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability as to which such party is herein prohibited from being indemnified.

6.10 *Other Activities*. Members, Managers and any Affiliates of any of them, may engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as directors, officers, stockholders, managers, members and general or limited partners of corporations, partnerships or other limited liability companies with purposes similar to those of the LLC. Neither the LLC nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

ARTICLE VII
Fiscal Matters

7.01 *Books and Records*.

The Board of Managers shall keep or cause the Treasurer to keep complete and accurate books and records of the LLC on the income tax method of reporting and otherwise in accordance with generally accepted accounting principles consistently applied, which shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the Act, at the office of the LLC for examination and copying by any officer, Member or Manager, or his, her or its duly authorized representative, at its reasonable request and at its expense during ordinary business hours. Upon request of any officer, Member or Manager, with reasonable opportunity to respond, and not more often than annually, the Treasurer shall provide such records which are maintained in a digital medium, electronically. A current list of the full name and last known address of each officer, Member and Manager; a copy of this Agreement and any amendments thereto; the Certificate, including all certificates of amendment thereto; executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, the Certificate or any certificate of amendment has been executed; and copies of the LLC's financial statements and federal, state and local income tax returns and reports, if any, for the three most recent fiscal years, shall be maintained at the registered office of the LLC required by Section 5 of the Act.

The LLC shall have no obligation to deliver or mail a copy of the Certificate or any amendment thereto to the Members.

7.02 *Reports*. Within 120 days after the end of each fiscal year, the Board of Managers shall cause to be prepared and sent to all Members a financial report of the LLC, including a balance sheet and a profit and loss statement, and, if such profit and loss statement is not prepared on a cash basis, a statement of changes in financial position, all of which shall be certified by an

independent certified public accountant. Within 90 days after the end of each fiscal year, the Board of Managers shall furnish (or cause to be furnished) to all Members with such information as may be needed to enable the Members to file their federal income tax returns and any required state income tax return. The cost of all such reporting shall be paid by the LLC as an LLC expense. Any Member may, at any time, at its own expense, cause an audit of the LLC books to be made by a certified public accountant of its own selection. All expenses incurred by such accountant shall be borne by such Member.

7.03 *Bank Accounts.* The Board of Managers or the Treasurer shall be responsible for causing one or more accounts to be maintained in a bank (or banks) that is a member of the FDIC, which accounts shall be used for the payment of the expenditures incurred by the Board of Managers and the officers in connection with the business of the LLC, and in which shall be deposited any and all cash receipts of the LLC. All deposits and funds not needed for the operations of the LLC may be invested in short term investments, including securities issued or fully guaranteed by United States government agencies; certificates of deposit of banks; bank repurchase agreements covering the securities of the United States government; commercial paper rated A or better by Moody's Investors Services, Inc.; money market funds; interest bearing time deposits in banks and thrift institutions; and such other similar investments as the Board of Managers may approve. All such amounts shall be and remain the property of the LLC, and shall be received, held and disbursed by the Board of Managers (or the Treasurer or such other officers of the LLC, as authorized by the Board of Managers) for the purposes specified in this Agreement. There shall not be deposited in any of said accounts any funds other than funds belonging to the LLC, and no other funds shall in any way be commingled with such funds. Withdrawals from any LLC bank or similar account shall be made and other activity conducted on such signature or signatures as shall be approved by the Board of Managers.

7.04 *Fiscal Year.* The fiscal year of the LLC shall end on December 31 of each year.

7.05 *Tax Matters Partner.* The Board of Managers shall designate a Member to serve as the "tax matters partner" of the LLC.

If, at any time, such person is not eligible under the I.R.C. to serve, or refuses to serve, as the tax matters partner, another Member shall be designated by the Board of Managers to serve as the tax matters partner. The tax matters partner is hereby authorized to and shall perform all duties of a tax matters partner under the I.R.C. and shall serve as tax matters partner until his, her or its resignation or until the designation of his, her or its successor, whichever occurs sooner.

ARTICLE VIII
Transfers of Interests

8.01 *General Restrictions on Transfer of Interests by Members.*

(a) No Member may Transfer his, her or its interest in the LLC unless the Board of Managers (acting exclusive of any Manager that is, or is affiliated with, the Transferring Member) shall have previously approved such Transfer in writing, approval of which shall not be unreasonably withheld, conditioned or delayed, if the transfer is for one hundred percent (100%) of his or her ownership. If the Member seeks to Transfer less than 100% of his or her ownership interest, the granting or denial of which approval shall be in the Board of Managers' absolute discretion.

No assignment of the interest of a Member shall be made if, in the opinion of counsel to the LLC, such assignment (i) may not be effected without registration under the Securities Act; (ii) would result in the violation of any applicable state securities laws; (iii) unless approved by the Board of Managers (acting exclusive of any Manager which is, or is affiliated with, the Transferring Member), would result in a termination of the LLC under I.R.C. § 708; or (iv) unless approved by the Board of Managers (acting exclusive of any Manager which is, or is affiliated with, the Transferring Member), would result in the treatment of the LLC as an association taxable as a corporation or as a "publicly traded limited partnership" for tax purposes. The LLC shall not be required to recognize any such assignment until the instrument conveying such interest has been delivered to the Board of Managers for recordation on the books of the LLC. Unless an assignee becomes a substituted Member in accordance with the provisions of Section 8.01(b), the assignee shall not be entitled to any of the rights granted to a Member hereunder, other than the right to receive all or part of the share of the, Net Profits, Net Losses, any items in the nature of income, gain, loss or deduction separately allocated to the Members, cash distributions or returns of capital to which his or her assignor would otherwise be entitled.

(b) An assignee of the interest of a Member, or any portion thereof, shall become a substituted Member entitled to all the rights of a Member if, and only if:

(i) the assignor gives the assignee such right;

(ii) the following persons, as applicable, shall have consented to such substitution in writing, and the granting or denying of which consent shall be in their absolute discretion:

(1) if the Board of Managers includes one or more MemberManagers (exclusive of any MemberManager who is, or is affiliated with, the assigning Member), all MemberManagers shall have unanimously consented to such assignment; or

(2) if clause (1) immediately above is inapplicable, all Members (exclusive of any Member who is, or is affiliated with, the assigning Member) shall have unanimously consented to such assignment;

(iii) the assignee pays to the LLC all costs and expenses incurred in connection with such substitution, including specifically, without limitation, costs incurred in the review and processing of the assignment and in amending the LLC's then current Certificate and/or Operating Agreement, if required; and

(iv) the assignee executes and delivers an Amendment to this Agreement (and to the Certificate, if required), which Amendment shall be executed by the President, Treasurer or other person authorized by the Board of Managers and by such assignee, and such other instruments, in form and substance satisfactory to the Board of Managers (acting exclusive of any Manager which is, or is affiliated with, the assigning Member), as may be necessary, appropriate or desirable to effect such substitution and to confirm the agreement of the assignee to be bound by the terms and provisions of this Agreement.

(c) The LLC, the Board of Managers and the officers of the LLC shall be entitled to treat the record owner of any LLC interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to such owner until such

time as a written assignment of such interest has been received and accepted by the Board of Managers and recorded on the books of the LLC. The Board of Managers may refuse to accept an assignment until the end of the next successive quarterly accounting period. In no event shall any membership interest, or any portion thereof, be sold, transferred or assigned to a minor or incompetent, and any such attempted sale, transfer or assignment shall be void and ineffectual and shall not bind the LLC or the Board of Managers.

8.02 *Transfers of Interests by Members Who Serve as Managers.*

(a) A Transfer or assignment of an interest by a MemberManager shall transfer only the economic interest, rights, duties and obligations of the transferor in its capacity as a Member, and no transferee shall obtain, as a result of such Transfer or assignment, any rights as a Manager.

(b) A MemberManager who assigns or Transfers all (but not less than all) of his, her or its interest as a Member shall be deemed to have tendered his, her or its resignation as a Manager to the Board of Managers effective as of the date of such transfer or assignment. A majority of the Board of Managers, exclusive of the resigning member, may accept or reject such resignation. If accepted, the acceptance date shall be the effective date of the resignation. Failure to reject such resignation within 30 days after the tender thereof shall be deemed to constitute acceptance of such resignation.

8.03 *Restrictions as to Certain Matters.* Every Transfer of an interest of a Member of the LLC permitted by this Article VIII shall be subject to the following restrictions.

(a) No Transfer of any interest in the LLC may be made if such Transfer would cause or result in a breach of any agreement binding upon the LLC or of then applicable rules and regulations of any governmental authority having jurisdiction over such Transfer. The Board of Managers may require as a condition of any Transfer that the transferor furnish an opinion of counsel, satisfactory to the LLC (both as to counsel and as to the substance of the opinion), that the proposed Transfer complies with applicable law, including federal and state securities laws, and does not cause the LLC to be an investment company as such term is defined in the Investment Company Act of 1940, as amended.

(b) The Board of Managers may require, as a condition to the admission to the LLC as a Member of any transferee who is not a Member, that such transferee demonstrate to the reasonable satisfaction of the Board of Managers that he, she or it is either a financially responsible person or has one or more financially responsible persons who have affirmatively assumed the financial obligations of the transferee under this Agreement, if any, on his, her or its behalf.

(c) Unless the Board of Managers has specifically approved otherwise in writing, a transferor of an interest as a Member of the LLC, if the transferee is a Member hereunder or if the transferee becomes a Member pursuant to the provisions of this Agreement, shall not be relieved of liability under this Agreement with respect to the transferred interest arising or accruing on or after the effective date of the Transfer, except to the extent of the payments made in the transferor's place by any transferee of its interest, and the LLC may proceed to collect any amount due from the transferor as and when due, together with interest thereon from the date for payment stated herein at the rate of ten percent per annum, compounded monthly, but not exceeding the maximum rate permitted by law, and all costs and expenses of collection incurred by the LLC

(including reasonable fees and disbursements of counsel).

(d) Any person who acquires in any manner whatsoever an interest (or any part thereof) in the LLC, whether or not such person has accepted and assumed in writing the terms and provisions of this Agreement or been admitted into the LLC as a Member as provided in Section 8.01(b), shall be deemed, by acceptance of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement with respect to such interest and shall be subject to the provisions of this Agreement with respect to any subsequent Transfer of such interest.

(e) Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to transfer any interest in the LLC, and shall not bind, or be recognized by, or on the books of, the LLC, and any transferee or assignee in such transaction shall not be or be treated as or deemed to be a Member for any purpose. In the event any Member shall at any time Transfer an interest in the LLC in contravention of any of the provisions of this Agreement, then each other Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach or threatened breach of the provisions of this Agreement concerning such transactions.

8.04 *Permitted Transfers*. The following Transfers shall be permitted without the approval of the Board of Managers or Members otherwise required under Section 8.01(a), above, but such permitted Transfers shall in any event be subject to Sections 8.01(b) and 8.03, hereof.

(a) An interest as a Member of the LLC may be Transferred, from time to time, to any legal representative(s) and/or Affiliate(s) and/or member(s) of the Immediate Family of the transferring Member.

8.05 *Tag-Along Rights*. In the event of a proposed Sale Transaction, Selling Member/s shall not Transfer any portion of his, her, its or their Membership Interest until the other Members have been given the opportunity, at their option, exercisable within ten (10) days after the date of Selling Members' written notice of the proposed Sale Transaction, to sell to the proposed Transferee at the same price and upon the same terms and conditions offered to the Selling Member, up to that percentage of the Membership Interest held by the other Members as is equivalent to the percentage of the Membership Interest held by Selling Member that Selling Member proposes to Transfer. In order to be entitled to exercise their rights to sell their Membership Interests pursuant to this Section 8.05, the other Members must agree to make to the Transferee substantially the same representations, warranties, covenants, indemnities and agreements as Selling Member agrees to make in connection with the proposed Sale Transaction.

As used herein, "Sale Transaction" means the Transfer in one transaction or a series of transactions (other than pursuant to a public offering under the Securities Act or pursuant to Rule 144), of all or any portion of his, her, its or their Membership Interests to one or more Persons or group of Persons (other than an Affiliate) and, as a result of which, such Person or group of Persons would own a majority of the outstanding Percentage Interests of the Company. As used herein, "Selling Member" means any Member involved with the Sale Transaction.

## ARTICLE IX
## Miscellaneous

**9.01** *Events Causing Dissolution.* The LLC shall be dissolved and its affairs wound up upon the following events:

(a) the sale or other disposition of all or substantially all of the assets of the LLC, unless the disposition is a transfer of assets of the LLC in return for consideration other than cash and the Board of Managers determines not to distribute all or substantially all of such noncash items to the Members;

(b) *Intentionally Omitted.*

(c) the election to dissolve the LLC made in writing by unanimous Consent of the Board of Managers and with the Members' Consent;

(d) any consolidation or merger of the LLC with or into any entity following which the LLC is not the resulting or surviving entity; or

(e) upon the occurrence of an event specified under the laws of the Commonwealth of Massachusetts as one effecting dissolution, except that where, under the terms of this Agreement or the Act, the LLC is not to terminate, then the LLC shall immediately be reconstituted and reformed on all the applicable terms, conditions and provisions of this Agreement.

**9.02** *Continuation of the LLC.* Notwithstanding the occurrence of an event specified in Section 9.01, the LLC shall not be dissolved and its business and affairs shall not be discontinued, and the LLC shall remain in existence as a limited liability company under the laws of the Commonwealth of Massachusetts, if the remaining Members acting by Consent, elect within 90 days after such occurrence to continue the LLC and the LLC's business.

**9.03** *Procedures on Dissolution.* Dissolution of the LLC shall be effective on the day that the event occurs that gives rise to the dissolution, but the LLC shall not terminate until the Certificate shall have been canceled and the assets of the LLC shall have been distributed as provided herein. Notwithstanding the dissolution of the LLC, prior to the termination of the LLC, as aforesaid, the business of the LLC and the affairs of the Members, as such, shall continue to be governed by this Agreement. The Board of Managers or a liquidator appointed by the Board of Managers, shall liquidate the assets of the LLC, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate.

**9.04** *Distributions upon Liquidation.*

(a) After payment of liabilities owing to creditors, the Board of Managers or such liquidator shall set up such reserves as it deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the LLC. Said reserves may be paid over by the Board of Managers or such liquidator to a bank, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations, and, at the expiration of such period as the Board of Managers or such liquidator may deem advisable, such reserves shall be distributed to the

Members or their assigns in the manner set forth in paragraph (b), below.

(b) After paying such liabilities and providing for such reserves, the liquidator shall cause the remaining net assets of the LLC to be distributed to all Members with positive Capital Account balances (after such balances have been adjusted to reflect all debits and credits required by applicable Treasury Regulations under I.R.C. § 704(b) for all events through and including the distribution in liquidation of the LLC), in proportion to and to the extent of such positive balances. In the event that any part of such net assets consists of notes or accounts receivable or other noncash assets, the liquidator may take whatever steps it deems appropriate to convert such assets into cash or into any other form which would facilitate the distribution thereof. If any assets of the LLC are to be distributed in kind, such assets shall be distributed on the basis of their fair market value net of any liabilities.

## ARTICLE X
## General Provisions

10.01 *Notices*. Except for notices of meetings of Managers and Members, notice of which shall be given in the manner provided in Sections 6.02(h) and 6.03(e), respectively, any and all notices under this Agreement shall be effective (a) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid; (b) on the first business day after being sent by express mail, receipt confirmed telecopy, or commercial overnight delivery service providing a receipt for delivery; (c) on the date of hand delivery; or (d) on the date actually received, if sent by any other method. To be effective, all such notices shall be addressed, if to the LLC, at its registered office under the Act, and if to a Member or Manager, at the last address of record on the LLC books, and copies of such notices shall also be sent to the last address that is known to the sender for the recipient, if different from the address so specified.

10.02 *Word Meanings*. Words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole, and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural, and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

10.03 *Binding Provisions*. Subject to the restrictions on transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, legal representatives, successors and assigns.

10.04 *Applicable Law*. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, including the Act, as interpreted by the courts of the Commonwealth of Massachusetts, notwithstanding any rules regarding choice of law to the contrary (provided that, as set forth in Section 6.05, to the extent not inconsistent with the specific provisions of this Agreement, the Act or the Certificate, the authority of the Board of Managers shall be determined by reference to the Delaware General Corporation Law).

10.05 *Counterparts*. This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the same counterpart.

10.06 *Separability of Provisions*. Each provision of this Agreement shall be considered

separable. To the extent that any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act (and, if the Act is subsequently amended or interpreted in such manner as to make effective any provision of this Agreement that was formerly rendered invalid, such provision shall automatically be considered to be valid from the effective date of such amendment or interpretation).

10.07 *Section Titles.* Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

10.08 *Amendments.* Except as otherwise specifically provided in this Agreement, including, without limitation, in Sections 2.05, 3.02, and Article VIII, this Agreement may be amended or modified only by a writing approved by the Members, acting by Consent, and any such amendment may include, without limitation, an amendment providing for capital contributions from, distributions to, and allocations of Net Profits and Net Losses (and items thereof) to one or more additional classes of Members, provided that:

(1) no such amendment shall increase the liability of, increase the obligations of or disproportionately adversely affect the interest of, any Member without the specific approval of such Member (except that an amendment adopted pursuant to Section 2.05 or Section 3.02 may reduce a Member's interest in the LLC without such Member's specific approval);

(2) if any provision of this Agreement provides for the approval or consent of a greater number of Members or of Members holding a higher percentage of the total Percentage Interests of the Members, any amendment effectuated pursuant to such provision, and any amendment to such provision, shall require the approval or consent of such greater number of Members or of Members holding such higher percentage of Percentage Interests;

(3) no such amendment shall increase the liability of or increase the obligations of the Board of Managers without the prior approval of the Board of Managers; and

(4) subject to clauses (1), (2) and (3), immediately above, any amendment to this Section 10.08 shall require the unanimous approval of all Members.

10.09 *Third-Party Beneficiaries.* The provisions of this Agreement, including Article III, are not intended to be for the benefit of any creditor (other than a Member or Manager in his, her or its capacity as such, who is a creditor) or other person (other than a Member or Manager in his, her or its capacity as such) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the LLC or any of the Members or Managers. Moreover, notwithstanding anything contained in this Agreement, including, without limitation, Article III, no such creditor or other person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the LLC or any Member or Manager.

10.10 *Entire Agreement.* This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter. The Members and Managers hereby agree that each Member and each Manager shall be entitled to rely on the provisions of

this Agreement, and no Member or Manager shall be liable to the LLC or any other Member or Manager for any action or refusal to act taken in good faith reliance on the terms of this Agreement.

10.11 *Waiver of Partition.* Each Member agrees that irreparable damage would be done to the LLC if any Member brought an action in court to dissolve the LLC. Accordingly, each Member agrees that he, she or it shall not, either directly or indirectly, take any action to require partition or appraisal of the LLC or of any of the assets or properties of the LLC, and, notwithstanding any provisions of this Agreement to the contrary, each Member (and his, her or its successors and assigns) accepts the provisions of the Agreement as his, her or its sole entitlement on termination, dissolution and/or liquidation of the LLC and hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale or other liquidation with respect to his, her or its interest, in or with respect to, any assets or properties of the LLC. Each Member agrees that he, she or it will not petition a court for the dissolution, termination or liquidation of the LLC.

10.12 *Mandatory Mediation and Binding Arbitration.*   All claims and disputes arising under or relating to this Agreement are to be first submitted to mediation, unless waived in writing by both parties, and if unsuccessful, settled by binding arbitration in the Commonwealth of Massachusetts or another location mutually agreeable to the parties. The arbitration shall be conducted on a confidential basis pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any decision or award as a result of any such arbitration proceeding shall be in writing and shall provide an explanation for all conclusions of law and fact and shall include the assessment of costs, expenses, and reasonable attorneys' fees unless agreed to be waived in writing by both parties.   An award of arbitration may be confirmed in a court of competent jurisdiction.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

| MANAGERS: | MEMBERS: | |
|---|---|---|
| Ronn Friedlander | Ronn Friedlander | ▬▬▬ |
| Benjamin Holmes | Benjamin Holmes | ▬▬▬ |
| Dan Rassi | Dan Rassi | ▬▬▬ |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | ▬▬▬ | |
| ▬▬▬ | | |

## SCHEDULE A
## TBD BREWING LLC

### MEMBERS

| Name and Addresses of Member | Percentage Interest | Capital Contributions |
|---|---|---|
| Ronn Friedlander, Manager<br>18A Prospect Hill Avenue<br>Somerville, MA 02144 | ███████ | ███████ |
| Benjamin Holmes, Manager<br>25 Spencer Ave.<br>Somerville, MA 02144 | ███████ | ███████ |
| Dan Rassi, Manager<br>25 Spencer Ave.<br>Somerville, MA 02144 | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |
| ███████ | ███████ | ███████ |



**TOTAL**                    100.00

## TAX MATTERS PARTNER

Ronn Friedlander
25 Spencer Ave
Somerville, MA 02144

## SCHEDULE B
## TBD BREWING LLC

### ORIGINAL MEMBERS

Ronn Friedlander
25 Spencer Ave.
Somerville, MA 02144

Benjamin Holmes
25 Spencer Ave.
Somerville, MA 02144

Dan Rassi
25 Spencer Ave.
Somerville, MA 02144



### ORIGINAL MANAGERS

Ronn Friedlander
25 Spencer Ave.
Somerville, MA 02144

Benjamin Holmes
25 Spencer Ave.
Somerville, MA 02144

Dan Rassi
25 Spencer Ave.
Somerville, MA 02144

## THIRD AMENDMENT TO LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT

### TBD BREWING LLC

On this the 5th day of April of 2017 (the "Effective Date"), pursuant to Section 10.08 of the TBD Brewing LLC's (the "LLC") Amended and Restated Limited Liability Company Operating Agreement, effective as of October 27, 2015 (the "Operating Agreement"); following a meeting of the Board of Managers, whose total Percentage Interest make-up more than fifty (50%) percent in interest in the LLC, at which they unanimously consented to the following amendments; the LLC hereby amends and augments the following Sections:

**Pursuant to Section 8.04(a), a Transfer of Interest has been accepted with the resulting percentage interests below, effective as of June 6, 2016:**

### SCHEDULE A
### TBD BREWING LLC

### MEMBERS

| Name and Addresses of Member | Percentage Interest | Capital Contributions |
|---|---|---|
| Ronn Friedlander, Manager<br>18A Prospect Hill Avenue<br>Somerville, MA 02143 | ██████ | ██████ |
| Benjamin Holmes, Manager<br>25 Spencer Ave.<br>Somerville, MA 02144 | ██████ | ██████ |
| Dan Rassi, Manager<br>25 Spencer Ave.<br>Somerville, MA 02144 | ████ | ██████ |
| ████████ | ████ | ██████ |
| ████████ | ███ | ██████ |
| ████████ | ████ | ██████ |
| ████████ | ███ | ██████ |
| ████████ | ████ | ██████ |

Date: _____

1



Date:



| | | |
|---|---|---|
| **TOTAL** | 100.00 | |

IN WITNESS WHEREOF, the parties hereto have approved and ratified these amendments under seal as of the Effective Date.

**MemberManagers:**

_____  ▆▆▆▆
Ronn Friedlander        Percentage Interest
Manager

_____  ▆▆▆▆
Benjamin Holmes         Percentage Interest
Manager

_____  ▆▆▆▆
Dan Rassi               Percentage Interest
Manager

3



**TRIDENT**
L E G A L

December 23, 2019

VIA E-mail

Attn: Benjamin Holmes

Cc: Adam Dash

RE: IMMEDIATE CEASE AND DESIST DEMAND BY AERONAUT

Dear Mr. Holmes:

I am writing on behalf of TBD Brewing LLC (DBA Aeronaut) ("Aeronaut") regarding your unlawful activities and breach of duties to Aeronaut. We are currently investigating the situation and are evaluating our legal options, including bringing any necessary legal action to seek equitable remedies, including injunctive relief, and recover damages for your unlawful conduct.

You are currently a Member and serve on the Board of Managers of Aeronaut. During the course of your relationship with Aeronaut you have had access to confidential company information, business records and trade secrets. It has come to our attention that while still serving in the capacity as Manager and Member, and being compensated for your service in this role, that you created a new directly competing company "Fab Cans". The fully developed website fab.beer notes that a new batch was tasted on December 6, 2019 and was set to be released on December 15, 2019. During this time you were receiving full manager benefits from Aeronaut without fully performing your duties. The Fab Cans labels were designed by the same artist being featured on Aeronaut cans, some utilizing the same artistic features, fonts and template – appearing to look exactly like an Aeronaut can.

It is still unclear the scope of what materials you have misappropriated from Aeronaut. However, we also discovered that the UPC code on one of the labels you put out from your competing company was one that had been purchased by, and was currently being utilized by Aeronaut for "Cocoa Sutra" which is still on merchants shelves which will lead to brand and product confusion besides it being company theft and a breach of duty to Aeronaut.

On December 19, 2019 immediately upon becoming aware of these facts Ben was notified about these concerns and told that he was utilizing company assets including the UPC which he was not authorized to do. After receiving no response on December 20, 2019 a follow-up e-mail was sent reminding him of his obligations and clearly stating that he did not have permission to misappropriate this company asset. It was then seen from the distributor of Aeronaut (who Ben has decided to also utilize in this endeavor) that his cans were to be released on December 20, 2019 and in the announcement they had Ben linked to Aeronaut social media accounts.

On December 19, 2019 we became aware of your attempt to change the password of the Instagram account "AeronautCans" to "fab_cans". This account was associated with an @aeronuat.net e-mail and was listed on Aeronaut's accounts register. The password of this account is a trade secret and this account is a company asset to which you have no rights. You have no right to any social media accounts that were created and used in furtherance of the mission of Aeronaut and shall not attempt to make any further changes.

You shall not utilize any such accounts and shall relinquish any passwords or login information you may possess.

In addition, between November 26-27 you exported over 20,000 of Aeronaut's contacts from MailChimp. This was after you'd been notified of a new manager slate proposed for this year's board of managers. That mailing list is a confidential company asset to which you have no rights. You shall destroy any and all copies and shall cease utilizing the list immediately and provide us with information regarding anywhere this list has already been used.

Massachusetts also imposes on you a continuing duty of loyalty and fiduciary duty, which prohibits you from disclosing Aeronaut's confidential or trade secret information at any time during or after your relationship with Aeronaut and acting against Aeronaut's interests during your relationship with Aeronaut.

Although our investigation is continuing, based on information currently available, Aeronaut has reason to believe that you are in violation of your contractual and common law obligations to Aeronaut by using and disclosing Aeronaut's confidential, proprietary, and trade secret information and stealing company property.

Based on the foregoing, we demand that you **immediately cease and desist** your unlawful activities and confirm in writing by the close of business on December 26, 2019 that you have complied and will continue to comply with the following:

1.     Cease and desist from using and/or disclosing Aeronaut's trade secrets and confidential and proprietary information.

2.     Immediately return and destroy all additional copies of all trade secrets and confidential or proprietary information belonging to Aeronaut, including, but not limited to, customer information, contact lists, business planning documents/models, exports of company email records or other data, financial information, and label templates.

3.     Cease and desist from all activities that violate your contractual obligations.

4.     Cease and desist from tortuously interfering with Aeronaut's business relations.

5.     Cease and desist all management duties at Aeronaut immediately and you shall tenure your resignation immediately today or we shall proceed with removal proceedings.

6.     Cease and desist use of any and all company resources for your personal gain or the gain(s) of any other parties.

7.     Cease and desist using company checks, credit cards, or other financial instruments.

8.     Cease and desist use of any subscription services or accounts that are paid for by Aeronaut.

9.     Make no further commitments on Aeronaut's behalf, financial or otherwise.

10.     Any product that currently exists utilizing Aeronaut's UPCs shall be pulled from shelves and production lines and either relabeled or destroyed immediately.

Aeronaut takes its business, confidential, proprietary, and trade secret information very seriously, and will take all necessary and appropriate steps to prevent any misappropriation or disclosure of its trade secrets or confidential information, or any breach of its contracts, tortious interference with its business relations, or usurpation of its corporate opportunities.

You are now on notice of potential litigation. You are required to take all necessary steps to preserve, and not destroy, conceal, or alter, any and all communications and documents relevant to this matter, including by way of example, and without limitation, emails, text messages, social media posts, voicemails, records, files, and other data, wherever located and regardless of the format or media. This includes communications with Dorchester Brewing Co., communications with Craft Collective, uses of email contacts from Aeronaut's lists, any uses of Aeronaut's social media accounts, records of company expenses you authorized, any information relating to the distribution of cans, and any communications with Aeronaut customers, employees or vendors. Purposeful destruction of such evidence could result in penalties, including legal sanctions.

This letter is not intended as a full recitation of the facts or a complete review of applicable law. Nothing contained in or omitted from this letter is or shall be deemed to be a limitation, restriction, or waiver of any of Aeronaut's rights or remedies, either at law or in equity, in connection with any of the matters raised herein, all of which are expressly reserved.

Thank you for your immediate attention to this matter.

Sincerely yours,

Sofia S. Lingos, Esq.
Trident Legal LLC

# ADAM DASH & ASSOCIATES
## ATTORNEYS AT LAW

48 GROVE STREET, SUITE 304
DAVIS SQUARE
SOMERVILLE, MA 02144

TELEPHONE (617) 625-7373
FAX (617) 625-9452
www.adamdashlaw.com

ADAM DASH
MELISSA HAGEMEISTER
MEGAN KEMP

VIA EMAIL ONLY AT sofia.lingos@trident.legal

December 26, 2019

Sofia S. Lingos, Esq.
Trident Legal LLC
2 Hawthorne Place,  Unit 12P
Boston, MA 02114

RE:   TBD Brewing LLC

Dear Ms. Lingos:

I represent Benjamin Holmes and am writing in response to your letter to Mr. Holmes dated December 23, 2019 on behalf of your client, TBD Brewing LLC ("TBD").

Please be advised that my client's actions with respect to the founding of Fab Cans were fully compliant with TBD's Operating Agreement, specifically Section 6.10 of that Agreement, which states:

6.10 *Other Activities*. Members, Managers and any Affiliates of any of them, may engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as directors, officers, stockholders, managers, members and general or limited partners of corporations, partnerships or other limited liability companies with purposes similar to those of the LLC.  Neither the LLC nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

The entire purpose of this section of the TBD Operating Agreement was to allow people in Mr. Holmes' situation to operate a business like Fab Cans.  Your client was well aware during the negotiation of the recent buyout agreement that my client was starting Fab Cans.  Only now that my client agreed to step away from TBD and signed the buyout agreement did your client raise Fab Cans as an issue.  In fact, according to TBD's Operating Agreement, it is not an issue at all.

LINGOS
December 26, 2019
Page 2

My client's re-use of a TBD UPC code was an unintentional mistake of which my client was unaware and for which my client apologizes. Thank you for pointing that out. My client wishes to note that mistakes like this are fairly common in the brewing industry. In fact, TBD accidentally used a Down the Road Brewing UPC sticker and allowed that product to remain on shelves without a recall. Mr. Holmes has taken action to correct the situation by pre-emptively relabeling all cans on the market and in distribution channels.

As you requested in your letter, my client will destroy copies of any and all confidential materials that Mr. Holmes may have accessed, and he will not use them for his new venture.

Mr. Holmes will be stepping down from his management duties with TBD on January 1, 2020, pursuant to the previously signed buyout agreement. In the meantime, Mr. Holmes will make no commitments on TBD's behalf or utilize TBD's subscription services.

Mr. Holmes received an email about returning his cell phone and switching his cell phone plan, and he will abide by that request as well.

I wish to point out that TBD has confiscated my client's personal social media account @tweetsyourcoasters, which is not TBD's property. My client asks that the password to said account please be turned over immediately to Mr. Holmes.

Furthermore, Mr. Holmes asks that TBD please abide by the terms of his agreement with TBD by having TBD immediately forward all email correspondence directed to Mr. Holmes' email address at TBD to Mr. Holmes' personal non-TBD email address, which is bh0085@gmail.com.

My client wishes to have a smooth transition under the buyout agreement, and hopes that the parties can accomplish same without further recriminations.

LINGOS
December 26, 2019
Page 3


Thank you.


Very truly yours,

Adam Dash


cc:    Benjamin Holmes, via email only



TRIDENT
— LEGAL —

December 31, 2019

VIA E-mail Only – Adam Dash, Esq.

RE: Response to Cease and Desist response December 26, 2019

Dear Attorney Dash:

I am writing on behalf of TBD Brewing LLC (DBA Aeronaut) ("Aeronaut") in response to the outstanding matters that have not been addressed by you and your client Benjamin Holmes.  There is nothing in the Operating Agreement that gives your client rights to use Aeronaut property for anything other than Aeronaut business, and especially not a competing venture.  For the record my client had absolutely no idea about Mr. Holmes's competing venture.  You indicated that Mr. Holmes was just starting Fab Cans during the buyout negotiations.  Could you kindly let us know the date on or about that this endeavor began?

Your assertion that the UPC misappropriation of Aeronaut property was just an unintentional mistake, if that was the case, serves to highlight the conflict, and not as a defense.  Additionally, when investigating your claim that this has been rectified, in walking into the first store and checking the shelves the cans were still there with Aeronaut's UPC as of December 28, 2019.  Please provide detailed information about how you have sought to rectify this situation, including dates.  We expect this to be completely rectified as you indicated in your response immediately and should have been done upon initial notice on December 19, 2019.

You did not specifically address the claim that your client exported over 20,000 of Aeronaut's contacts from MailChimp.  All mailing and contact lists are confidential company assets to which your client has no rights.  Please remind your client that these may not be used as they are Aeronaut property.  Kindly include how this information has been used to date and specific confirmation that contacts and contact information obtained through Aeronaut mailing lists have been destroyed.

Aeronaut has only maintained the social media accounts that are company property as indicated by their inclusion on company's social media register.  We maintain that these are company assets and any attempt to access, utilize or convert such accounts will not be accepted.

In addition to everything addressed in our letter dated December 23, 2019 the following outstanding matters remain to be addressed:

1.  Return of any and all company property by or before January 1, 2020, including but not limited to:

    a.  Copies of all keys, key cards or access codes.  If these are not returned on or by January 1, 2020 Aeronaut shall have to rekey the establishment and Mr. Holmes shall be personally liable for the cost.

    b.  Mr. Holmes's cell phone, billed to Aeronaut, shall be returned to Verizon for full credit to Aeronaut totaling $949 or payment to Aeronaut of the amount in full.  Also removing service of his phone line from the Aeronaut company plan.

    c.  Check in the amount of $569.73 made out to the company to cover the personal bank levy #359006 made by the DOR on 3/9/2018 in Mr. Holmes's name for his personal income tax. ($519.73 for the levy + $50 levy fee = $569.73)

    d.  7 poster prints of Nami Mono (35,36,37,38,39,40,41) or any monies received from sales of such ($1400).

    e.  4 artist rendition prints with the 4 frames purchased on 10/16/2019 and 11/15/2019, along with the receipts.

2.    Provide written notice pursuant to the operating agreement of Mr. Holmes's resignation by January 1, 2020.  We maintain that his actions warrant a right to remove him for cause (which is not a requirement), but in the interest of effectuating the timely termination we will accept the resignation and doing so is severed from any claims.

3.    Cease and desist from using and/or disclosing Aeronaut's trade secrets and confidential and proprietary information and send notification that he will not utilize the contacts that were illegally obtained by exporting the confidential trade secrets.

4.    Immediately return and destroy all additional copies of all trade secrets and confidential or proprietary information belonging to Aeronaut, including, but not limited to, customer information, contact lists, business planning documents/models, exports of company email records or other data, financial information, and label templates.

5.    Any product that currently exists utilizing Aeronaut's UPCs shall be pulled from shelves and production lines and either relabeled or destroyed immediately.

It is our hope that these matters can all be attended to forthwith so that we can proceed with the agreed upon course of action.  We look forward to your response and attention.

Sincerely yours,

Sofia S. Lingos, Esq.
Trident Legal LLC

Cc via e-mail: Ronn Friedlander | Dan Rassi

# ADAM DASH & ASSOCIATES
## ATTORNEYS AT LAW

48 GROVE STREET, SUITE 304
DAVIS SQUARE
SOMERVILLE, MA 02144

TELEPHONE (617) 625-7373
FAX (617) 625-9452
www.adamdashlaw.com

ADAM DASH
MELISSA HAGEMEISTER
MEGAN KEMP

VIA EMAIL ONLY AT sofia.lingos@trident.legal

January 2, 2020

Sofia S. Lingos, Esq.
Trident Legal LLC
2 Hawthorne Place, Unit 12P
Boston, MA 02114

RE:   TBD Brewing LLC

Dear Attorney Lingos

As you know, I represent Benjamin Holmes and am writing in response to your letter to me dated December 31, 2019 on behalf of your client, TBD Brewing LLC ("TBD").

In response to your areas of inquiry, my client states the following:

With respect to the TBD corporate mailing list, my client had been previously informed by the TBD partners that, in lieu of keeping my client's corporate "Google Apps" account information, he would be allowed to back up his account information, including his emails and documents from TBD. This is important, since as both an owner and employee, my client had completely organized his communications, calendar, etc. using his IT resources at TBD, essentially dropping all other forms of communication, including his personal email address. These crucial records, which my client is now locked out of, are of a highly personal nature and were used with a reasonable expectation of privacy and recovery. Therefore, please:

A.  Begin forwarding my client's emails to him as requested; and

LINGOS
January 2, 2020
Page 2

B. Allow my client to download archives of his past communications and personal documents and records with an exported Google Drive archive of files owned by him on Google Apps, and Gmail ".mbox" backup, as was verbally agreed to by your clients.

My client agrees not to use any TBD Mailchimp contacts for the purposes of his new business, and he will destroy any that he has by deleting any files which were downloaded.

The account @tweetsyourcoasters is simply a personal social media account of my client, and is not a TBD account. It has always been labeled as such. Please return access of this account to my client. I should note that my client is not aware of any "social media roster" for TBD.

I confirm receipt today of two checks from your client, which were payable to my client, in the amounts of $75,000.00 and $2,380.00. I have given those checks to my client.

Regarding your numbered list of other requests:

1.

    a. My client has one key to the TBD facility and will return it.
    b. My client will return the cell phone to Verizon.
    c. My client has not heard anything about this levy issue for a long time. If the levy was for my client personally, then please provide documentation to that effect and my client will reimburse TBD for it.
    d. My client is not entirely sure which prints you are referencing, but it sounds like you mean the ones that were used in an art exhibition in late October or November. My client will try to locate them, and can also put your client in touch with the artist to discuss this matter, if you like.
    e. All artist proofs are owned by artists. This is typical practice. The framing was paid for by TBD to facilitate the exhibition of the artwork, thereby generating excitement for the works in the edition. In order to help resolve matters, my client is willing to reimburse TBD for the framing cost, if your client can provide a receipt for same.

LINGOS
January 2, 2020
Page 3

2.  My client will provide a written resignation from TBD.  I should note that my client learned on December 31, 2019 that the principals at TBD have been reaching out to certain collaborators, specifically their brewer, and sharing information about my client being removed from TBD.  Obviously, this is a problem.  The best solution would be for our clients to agree that an email will go out, mutually drafted, and sent to TBD's staff, mailing list, and any collaborators that your client wishes to inform, announcing my client's voluntary departure and providing my client's current contact information.  This will provide a positive statement explaining the departure on good terms and will provide your clients with language that they can use if they need to explain the separation for any reason in the future.

3.  As previously indicated, my client will not use any confidential information or trade secrets of TBD for any new business ventures.

4.  My client will destroy any trade secrets and confidential property of TBD, except subject to my client's request above for his personal communications and documents to be provided to him.

5.  Over the past two weeks, my client has relabeled more than ten thousand cans to replace the mislabeled UPC code for the brand "Squid Pro Quo", both in the distribution chain, and directly, in stores.  As I mentioned in my December 26, 2019 letter to you, this is a fairly common mistake in the industry, and it has been addressed with diligence and haste.  If your client would like to point my client to a location that he may have missed, please have them contact my client's operations department, ops@fab.beer, and my client will be happy to address any further issues regarding this matter.

Thank you

Very truly yours,

Adam Dash



# SQUID PRO QUO

Chico-fermented
West coast-style Ale
Artwork by ANDY JACOB



**GOVERNMENT WARNING:** (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems.



8 57600 23371 6